UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Nº 09 Civ. 3007 (RJS)
_____

MARC BONNANT,

Plaintiff,

VERSUS

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. and MERRILL LYNCH CAPITAL SERVICES, INC.,

Defendants.

_____

MEMORANDUM AND ORDER
June 25, 2009
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff brings this action pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 4, 206, seeking to enjoin third-party claims that Defendants have filed against him in arbitral proceedings before the Financial Industry Regulatory Authority ("FINRA"). Before the Court is Plaintiff's application for a preliminary injunction. For the reasons set forth below, Plaintiff's application is denied.

I. BACKGROUND[1]

Plaintiff is a "high profile attorney" who resides in Switzerland and is a member of the Geneva bar. (Campbell Decl. ¶ 4; Bonnant Decl. ¶ 5.) Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") is a broker-dealer licensed by the Securities and Exchange Commission, and a member of FINRA. (Campbell Decl. ¶¶ 1-2.) Defendant Merrill Lynch Capital Services, Inc.

---

[1] The Court recites only those facts that are relevant to Plaintiff's application for a preliminary injunction, and nothing in this Order constitutes a finding of fact.

("MLCS") is a member of the International Swaps Dealers Association ("ISDA"). (*Id.* ¶ 2.)

According to Plaintiff, Sophin Investments, S.A. ("Sophin") is a British Virgin Islands company that he created at the direction of Camelia Nasser de Kassin ("Kassin"). (Bonnant Decl. ¶¶ 3, 6.) Sophin was allegedly established to allow Kassin to invest a multi-million dollar inheritance that she received from the estate of a woman named Lily Safra. (*Id.* ¶ 4.)

Sophin's sole shareholder is a Lichtenstein Trust known as Mappemonde, Vaduz ("Mappemonde"). (*Id.* ¶ 6.) Plaintiff represents to the Court that he acts as the sole officer, director, and trustee of Mappemonde. (*Id.*)[2] Kassin is Mappemonde's primary beneficiary, and her husband and children are designated as the trust's secondary beneficiaries. (*Id.*)

A.  The Sophin Account at Merrill Lynch

On November 12, 2001, Plaintiff opened a non-discretionary "International CMA Account" in the name of "Sophin Investment" at Merrill Lynch's offices in Manhattan (the "Sophin ICMA Account"). (Campbell Decl. ¶ 5 & Ex. B; Bonnant Decl. ¶ 8 & Ex. 1.) The "Application and Agreement" form that was completed on behalf of Sophin designates the account as "corporate." (Bonnant Decl. Ex. 1 at 1.)

---

[2] Plaintiff acted as Safra's attorney during her lifetime. (Bonnant Decl. ¶ 4.) Kassin's two brothers also received large inheritances from Safra, and Plaintiff established corporate entities that were similar to Sophin for those individuals as well. (*Id.* ¶ 7.) Plaintiff also served in similar capacities with respect to these entities, at least nominally. (*Id.*; *see also* Campbell Decl. ¶ 5.)

The front page of the account-opening agreement lists "Sophin Investment" as the "Primary Accountholder," and the line for "Additional Accountholders" on the form is blank. (*Id.*) On the signature page of the document, however, Plaintiff signed his name twice — once as Sophin's "Authorized Representative" and once as an additional "Accountholder." (*Id.* at 4.) Above the signature block on the page that Plaintiff signed twice, the document states in bolded text:

> BY SIGNING BELOW, I ACKNOWLEDGE . . . THAT IN ACCORDANCE WITH PARAGRAPH 8 OF THE AGREEMENT I AM AGREEING IN ADVANCE TO ARBITRATE ANY CONTROVERSIES WHICH MAY ARISE WITH [MLPF&S] . . . .

(*Id.*) Paragraph eight bears the heading "Agreement to Arbitrate Controversies with MLPF&S," and states that the parties to the agreement "agree that all controversies which may arise . . . shall be determined by arbitration." (Campbell Decl. Ex. B at 8.)

A subsequent "Confidential Letter" from Plaintiff to MLPF&S, which bears illegible initials dated March 19, 2004 and an electronic stamp dated March 26, 2004, states:

> I hereby confirm that the account(s) which you are carrying for me, designated as follows:
>
> Sophin Investments . . .
>
> is/are my account(s), that I am the sole owner thereof, that said account(s) may be considered by you for margin and other purposes part of my general account with you, that any and all

2

agreements made by me with reference to my account or accounts with you shall apply to the account(s) designated as above, with the same force and effect as through the account(s) so designated stood in my own name without qualification.

Yours truly,
[Plaintiff's signature]

(Campbell Decl. Ex. L.)

Plaintiff also executed three "Standard Option Agreements" relating to the Sophin ICMA Account, which are dated October 11, 2002, February 10, 2006, and October 29, 2007, respectively. (Bonnant Decl. Exs. 8-10.) Each of these agreements also contains an arbitration clause. (*Id.*) The October 11, 2002 agreement lists "Sophin Investment" as a client, and "Marc Bonnant" as an "Additional Client[]." (*Id.* Ex. 8.) The February 10, 2006 agreement contains a section titled "For Personal Holding Companies Only," in which Plaintiff is listed as the "Beneficial Owner[] or Principal Owner[]" of Sophin. (*Id.* Ex. 9.)

On September 18, 2006, Plaintiff executed an "ISDA Master Agreement" on behalf of Sophin, which governed interest swap transactions conducted by Sophin through MLCS (the "Sophin ISDA Agreement"). (Campbell Decl. Ex. K.) MLCS was the counterparty on the agreement, and MLPF&S was not a signatory. However, MLPF&S unconditionally guaranteed all payments owed by MLCS, and MLPF&S was also designated as a "Credit Support Provider" to MLCS. (*Id.* at 25, 29.)

Between October 2007 and April 2008, the Sophin ICMA Account allegedly experienced significant losses relating to trading in naked options and swaps, at least some of which were governed by the Sophin ISDA Agreement. (Bonnant Decl. Ex. 2 ¶¶ 23-25.) As a result of the trading, a $2,487,511 deficit accrued in the Sophin ICMA Account. (*Id.* Ex. 4 at 11.)

B.  The FINRA Arbitral Proceedings

On July 7, 2008, representatives of Sophin commenced an arbitration before FINRA against MLPF&S and MLCS. (*Id.* Ex. 2.) In the Statement of Claim, Sophin alleged that Kassin — rather than Plaintiff — was Sophin's beneficial owner, and that the losses in the Sophin ICMA Account were "the result of unauthorized and unsuitable trades, which were made as a result of misleading, and indeed fraudulent, information placed by an unknown person in Merrill Lynch's files concerning the Sophin Account." (*Id.* ¶¶ 4, 12, 28.)

On September 26, 2008, MLPF&S and MLCS answered Sophin's Statement of Claim. (Bonnant Decl. Ex. 4.) In their response, Defendants asserted that Plaintiff authorized the trading in the Sophin ICMA Account, and they brought a counterclaim against Sophin seeking to recover $5,470,260.27. (*Id.* at 15, 17-18.) The damages sought by Defendants in the counterclaim included a $2,982,749.27 "early termination fee" calculated pursuant to the Sophin ISDA Agreement, and the $2,487,511 deficit in the Sophin ICMA Account. (*Id.* at 17-18.)

In a December 3, 2008 letter to FINRA, Defendants named Plaintiff as a third-party in

3

the arbitral proceedings. (*Id.* Ex. 6.) Defendants seek "an award against Mr. Bonnant in the amount of any affirmative award issued by the Panel against [Defendants] . . . ." (*Id.* at 3-4.) Plaintiff responded to Defendants' third-party claims on February 18, 2009, arguing that FINRA lacked jurisdiction over him because he signed all the agreements relating to Sophin's accounts in a representative capacity. (*Id.* Ex. 7.)

### C.  Procedural History

Plaintiff commenced this action on March 27, 2009, seeking "preliminary and permanent injunctions" against Defendants "to enjoin [Defendants] from bringing claims in arbitration against [P]laintiff." (Compl. ¶ 1.) On April 8, 2009, Defendants responded in opposition to Plaintiff's application for a preliminary injunction (Doc. No. 3), and they filed supplemental materials on April 10, 13, and 14, 2009, respectively (Doc. Nos. 5-7). The parties subsequently stipulated to an extension of Defendants' time to respond to the Complaint, and Defendants answered on May 4, 2009. (Doc. Nos. 11-12.)

On May 21, 2009, the Court conducted oral argument regarding Plaintiff's application for a preliminary injunction. Following the argument, in a May 28, 2009 letter, Plaintiff declined to convert his application to a motion for summary judgment. After receiving several additional submissions from the parties, as well as a June 2, 2009 letter from Alexander Bau, Esq., counsel for certain undisclosed non-parties, the Court conducted additional oral argument on June 18, 2009.

## II. LEGAL STANDARDS

### A.  Preliminary Injunctions

A preliminary injunction is a "drastic remedy." *City Merchandise, Inc. v. Broadway Gifts Inc.*, No. 08 Civ. 9075 (RJS), 2009 WL 195941, at *1 (S.D.N.Y. Jan. 27, 2009). Therefore,

> "[a] party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is denied."

*Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 344 (S.D.N.Y. 2008) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007)). The party seeking the preliminary injunction must establish these elements by a preponderance of the evidence. *See id.*

"Normally a preliminary injunction is preliminary to further proceedings in a district court; if the plaintiff prevails, he is entitled to a 'final injunction.' However, in some circumstances a plaintiff seeks injunctive relief that is preliminary not to further district court proceedings but to proceedings in some other forum." *Manning v. Energy Conversion Devices, Inc.*, 833 F.2d 1096, 1100 (2d Cir. 1987). In the latter type of cases, "the relief requested, though labeled a 'preliminary injunction,' is for all practical purposes a 'final injunction' of limited duration." *Vittoria Corp. v. New York Hotel & Motel*

*Trades Council, AFL-CIO*, 30 F. Supp. 2d 431, 437 (S.D.N.Y. 1998).

B.  Adjudication of Arbitrability Disputes

"The basic principles governing adjudication of arbitrability disputes in the federal courts were established by the Supreme Court in three cases known as the *Steelworkers Trilogy*." *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 982 (2d Cir. 1997) (citing *Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564 (1960), *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960), and *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960)).

> These principles essentially provide: (1) "that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit," (2) "that the question of arbitrability . . . is undeniably an issue for judicial determination," and (3) "that, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."

*Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-50 (1986)). Thus, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 53 (2d Cir. 2001) (internal quotation omitted). "Once the court determines, however, that an arbitration agreement exists between the parties, and '[w]here the scope of the agreement is unlimited, issues addressed to the liability of the parties . . . , rather than the agreement to arbitrate, are to be determined by the arbitrator.'" *Brown v. Caldarella*, No. 08 Civ. 857 (DLC), 2008 WL 857983, at *1 (S.D.N.Y. Mar. 31, 2008) (quoting *Maria Victoria Naviera, S.A. v. Cementos Del Valle, S.A.*, 759 F.2d 1027, 1031 (2d Cir. 1985)).

III.  DISCUSSION

Plaintiff seeks to enjoin Defendants from pursuing third-party claims against him in the FINRA arbitration commenced by Sophin. "The Second Circuit has held that a party suffers irreparable harm if it is 'forced to expend time and resources arbitrating an issue that is not arbitrable.'" *Centocor, Inc. v. The Kennedy Inst. of Rheumatology*, No. 08 Civ. 8824 (DC), 2008 WL 4726036, at *2 (S.D.N.Y. Oct. 29, 2008) (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)); *accord Md. Cas. Co.*, 107 F.3d at 985. Thus, with respect to Plaintiff's application for a preliminary injunction, the "irreparable harm" element is satisfied. However, Plaintiff has not made a sufficient showing that his causes of action before this Court are meritorious, and he has not demonstrated that the balance of hardships weighs in his favor. Accordingly, for the reasons set forth below, Plaintiff's application for a preliminary injunction is denied.

A.  Likelihood of Success on the Merits

"Arbitration is contractual by nature — 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *Warrior & Gulf*

5

*Navigation*, 363 U.S. at 582). Thus, the evaluation of the merits of Plaintiff's claims in this action requires a determination of the applicability of the arbitration clauses in the agreements relating to the Sophin ICMA Account.

"In determining a party's obligations under a contract, 'the initial interpretation of a contract is a matter of law for the court to decide.'" *Nat'l Utility Serv., Inc. v. Tiffany & Co.*, No. 07 Civ. 3345 (RJS), 2009 WL 755292, at *6 (S.D.N.Y. Mar. 20, 2009) (quoting *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)). Absent ambiguity with respect to the interpretive question presented, the Court's inquiry is limited to the four corners of the relevant agreement. *See id.*

Applying these principles, and based on the record before the Court on Plaintiff's application for a preliminary injunction, Plaintiff has not demonstrated a sufficient likelihood of success on the merits of his claims to entitle him to a preliminary injunction. Specifically, Plaintiff signed the account-opening agreement for the Sophin ICMA Account in an individual capacity, which obligates him to "arbitrate any controversies" regarding the account that arise with MLPF&S. (Bonnant Decl. Ex. 1 at 4.) Moreover, although Defendant MLCS is not a signatory to the agreements regarding the Sophin ICMA Account, principles of estoppel appear to bar Plaintiff from successfully challenging the arbitrability of MLCS's third-party claim against him.

### 1. MLPF&S

With respect to the arbitrability of MLPF&S's claim, Plaintiff signed the account-opening agreement for the Sophin ICMA Account twice. (*Id.* Ex. 1 at 4.) His self-serving assertion that the second signature was merely "superfluous" does not make it so. (*See* Pl.'s Mem. at 11.) "'[E]veryone in business knows that an individual stockholder or officer is not liable unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice — once as an officer and again as an individual.'" *Ainbinder v. Kelleher*, No. 92 Civ. 7315, 1997 WL 420279, at *13 (S.D.N.Y. June 25, 1997) (Sotomayor, J.) (quoting *Salzman Sign Co., Inc. v. Back*, 10 N.Y.2d 63, 67 (N.Y. 1961)). Thus, Plaintiff's second signature, as a separate "[a]ccountholder," indicates that Plaintiff opened the Sophin ICMA Account in both representative and personal capacities. Therefore, it appears that Plaintiff is contractually obligated to arbitrate disputes with MLPF&S regarding the account.

Moreover, to the extent the account-opening agreement is ambiguous regarding this issue and it is appropriate to look outside the four corners of the document, there is additional evidence in the record suggesting that Plaintiff opened the Sophin ICMA Account in both representative and individual capacities. First, Plaintiff is listed as an "additional client[]" on the October 11, 2002 Standard Option Agreement relating to the Sophin ICMA Account. (Bonnant Decl. Ex. 8.) Second, Plaintiff signed a letter to MLPF&S stating that the Sophin ICMA Account "is [his] account," that Plaintiff is "the sole owner thereof," and that "*any and all agreements* made by [Plaintiff] with reference to [Plaintiff's] account . . . shall apply to the [Sophin ICMA Account] with the same force and effect as though the account . .

6


. so designated *stood in* [*Plaintiff's*] *own name without qualification*." (Campbell Decl. Ex. L (emphasis added).) Like his two signatures on the account-opening agreement, this language also suggests that Plaintiff opened the Sophin ICMA Account in both representative and individual capacities. Therefore, in light of these documents, Plaintiff has not demonstrated a likelihood of success on the merits of his application for injunctive relief against MLPF&S.

2. MLCS

The arbitrability of MLCS's claim against Plaintiff presents a somewhat closer question, as MLCS is not a signatory to the agreements regarding the Sophin ICMA Account. Nevertheless, the Court concludes that Plaintiff likewise has failed to demonstrate a sufficient likelihood of success on the merits to entitle him to a preliminary injunction with respect to MLCS.

"[U]nder principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)); *see also Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276, 279-81 (2d Cir. 2003); *Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999). The Second Circuit has not defined "the minimum quantum of 'intertwined-ness' required to support a finding of estoppel . . . ." *JLM Indus.*, 387 F.3d at 178.

Additionally, while "intertwined-ness" is a precondition to estoppel in this context, there must also be a "relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d. Cir. 2008). In this regard, the Court notes that the "cases which have applied estoppel against a party seeking to avoid arbitration have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of *corporate* relationship to a signatory party." *Ross v. Am. Exp. Co.*, 547 F.3d 137, 144 (2d Cir. 2008) (emphasis in original).

There is evidence in the record suggesting that MLCS may successfully invoke these estoppel principles because: (1) the third-party claim by MLCS is intertwined with the agreements signed by Plaintiff underlying the Sophin ICMA Account; and (2) the relationships between Sophin, Plaintiff, MLPF&S, and MLCS are such that Plaintiff may not avoid his obligation to arbitrate this third-party claim with MLCS.

"Claims are intertwined 'where the merits of an issue between the parties [are] bound up with a contract binding one party and containing an arbitration clause.'" *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (quoting *JLM Indus.*, 387 F.3d at 178 n.7)). MLCS's third-party claim

7

against Plaintiff is one for indemnity in relation to Sophin's claims against MLCS. (*See* Bonnant Decl. Ex. 6 at 3.) The merits of this claim depend on the respective obligations of Sophin, Plaintiff, and MLPF&S as to the Sophin ICMA Account. The account-opening agreement for the Sophin ICMA Account, in turn, contains an arbitration clause to which Plaintiff appears to be bound in his individual capacity.

Moreover, MLCS's claim against Plaintiff also relates, in part, to the $2,982,749.27 "early termination fee" calculated pursuant to the Sophin ISDA Agreement. (*See* Campbell Decl. Ex. K at 8.) This aspect of MLCS's claim implicates the link between the definition of "Events of Default and Termination Events" under the Sophin ISDA Agreement (Campbell Decl. Ex. K at 5-6), and the contractual obligations of the accountholders of the Sophin ICMA Account (*see* Campbell Decl. Ex. B). Specifically, a default-triggering event in connection with the Sophin ICMA Account constitutes a "Cross Default" under the Sophin ISDA Agreement. (*Id.* Ex. K at 5-6, 17.) A "Cross Default" fits within the broader category of an "Event of Default" under the Sophin ISDA Agreement (*id.* at 5-6), the occurrence of which may give rise to an obligation on the part of the defaulting party to remit an early termination fee. (*Id.* Ex. K at 8-9.)

In fact, Defendants' counterclaim against Sophin in the FINRA arbitration is based on these intertwined default provisions. (*See* Bonnant Decl. Ex. 4 at 12; *id.* Ex. 6 at 3.) Specifically, Defendants allege that timely payments were not made on the outstanding deficit in the Sophin ICMA account, which constituted a default in that account and a cross default under the Sophin ISDA Agreement. (*Id.* Ex. 4 at 12; *see also* Defs.' Mem. at 17-18.) They further allege that the cross-default under the Sophin ISDA Agreement obligated Sophin to pay MLCS a $2,982,749.27 early termination fee. (*Id.* Ex. 4 at 12.) MLCS's success on the merits of that counterclaim against Sophin may affect the "amount of any affirmative award" issued by FINRA against Defendants, which would affect the amount of damages MLCS seeks in its third-party indemnity claim against Plaintiff. Therefore, with respect to the application of the estoppel doctrine, the Court concludes that the merits of MLCS's third-party claim against Plaintiff are sufficiently intertwined with the Sophin ICMA Account.

Finally, as the foregoing discussion suggests, the relationship between the parties is such that Plaintiff is estopped from denying an obligation to arbitrate with MLCS. MLCS is a corporate "affiliate" of MLPF&S. (Campbell Decl. ¶ 2.) Plaintiff executed the Sophin ISDA Agreement on behalf of Sophin. (*Id.* ¶ 2; see also *id.* Ex. K at 18.) MLPF&S acted as a "Credit Support Provider" under the Agreement, and unconditionally guaranteed "all amounts payable" by MLCS. (Campbell Decl. Ex. K at 25, 29.) Through the agreement with MLCS, Plaintiff is alleged to have authorized interest swap transactions, on behalf of Sophin, using funds from the Sophin ICMA Account. (*See* Bonnant Decl. Ex. 6.) Therefore, given the nature of the claim at issue and the relationships between Sophin, Plaintiff, MLPF&S, and MLCS, it appears that MLCS will be able to successfully invoke the doctrine of estoppel in this action in support of its third-party arbitration claim against Plaintiff. Accordingly, Plaintiff has not established a likelihood of success on the

8

merits of his claim for an injunction against MLCS.

### B. Balance of Hardships

Assuming, *arguendo*, that there are "sufficiently serious questions" regarding the merits of Plaintiff's application for injunctive relief, he has nevertheless failed to establish that the "balance of hardships tips decidedly in [his] favor . . . ." *Procter & Gamble*, 574 F. Supp. 2d at 344. First, considerations of efficiency militate in Defendants' favor. As discussed above, the claims and third-party claims in the FINRA arbitration are significantly related, and separate proceedings regarding these issues would be duplicative.

More importantly, it appears that Plaintiff misrepresented to MLPF&S that he was the beneficial owner of the Sophin ICMA Account. (*See* Bonnant Decl. Ex. 9; Campbell Decl. Ex. L.) Sophin contradicted that representation when it initiated the FINRA arbitration against Defendants and asserted that Kassin, not Plaintiff, is Sophin's beneficial owner. (*See* Bonnant Decl. Ex. 2 ¶ 4.) Similarly, in this litigation, Plaintiff disclaims his prior representation that he is the beneficial owner of the Sophin ICMA Account and asserts that he acted solely at the behest of Kassin. (*See* Bonnant Decl. ¶ 8.)

Even if Kassin is actually the beneficial owner of the account, it seems clear that Defendants relied on Plaintiff's misrepresentation during the administration of Sophin's accounts by extending credit to Sophin based on the parties' agreements. Moreover, representatives of Sophin commenced the arbitral proceedings that Plaintiff now attempts to enjoin. The balance of hardships cannot be said to "decidedly" favor a litigant who seeks to benefit from deception and avoid the consequences of his previous representations.

### IV. CONCLUSION

For the reasons set forth herein, Plaintiff has not demonstrated that his claims in this action are likely to be meritorious, or that the balance of hardships weighs in his favor. Accordingly, Plaintiff's application for a preliminary injunction is denied.

The parties are HEREBY ORDERED to submit a joint letter to the Court by July 6, 2009 regarding the status of the FINRA arbitral proceedings.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: June 25, 2009
New York, New York

\*\*\*

Plaintiff is represented by David John Hoffman, One Whitehall Street, Suite 1825, New York, New York 10004. Defendants are represented by David J. Libowsky, Bressler, Amery & Ross, PC, 17 State Street, New York, New York 10004.