**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARC BONNANT,<br><br>                    Plaintiff,<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER &<br>SMITH INCORPORATED and MERRILL<br>LYNCH CAPITAL SERVICES, INC.,<br><br>                    Defendants. | Civil Action No. 09-Civ. 3007 (RJS) |

---

MEMORANDUM  OF LAW OF DEFENDANTS MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED AND MERRILL LYNCH CAPITAL SERVICES, INC. IN
OPPOSITION TO PLAINTIFF MARC BONNANT'S MOTION TO VACATE OR MODIFY
JUDGMENT

---

BRESSLER, AMERY & ROSS
A Professional Corporation
17 State Street
New York, New York 10004
212-425-9300
Attorneys for Defendants
Merrill Lynch, Pierce, Fenner and Smith
Incorporated and Merrill Lynch Capital
Services, Inc.

On the Brief:

        David J. Libowsky, Esq.

## TABLE OF CONTENTS

Page

TABLES OF AUTHORITIES ................................................................................... ii

INTRODUCTORY STATEMENT ............................................................................1

STATEMENT OF FACTS .........................................................................................2

ARGUMENT ..............................................................................................................2

POINT I .............................................................................................................2

THIS COURT SHOULD DENY PLAINTIFF'S MOTION TO VACATE
OR OTHERWISE MODIFY THE MAY 18, 2010 JUDGMENT .....................2

A.      Plaintiff Has Failed to Establish Grounds for Vacating or
Otherwise Modifying The May 18, 2010 Judgment Under
Either Rule 60(b)(2) or (3). ..................................................................3

CONCLUSION.........................................................................................................12

# TABLES OF AUTHORITIES

CASES                                                                                                    PAGE(S)

Boule v. Hutton,
    328 F. 3d 84 (2d Cir. 2003)................................................................................................8

Casella v. Equifax Credit Information Services,
    56 F. 3d 469 (2d Cir. 1995)................................................................................................8

Fleming v. New York University,
    865 F. 2d 478 (2d Cir. 1989)..............................................................................................5

Gonzalez v. Gannett Satellite Information Network, Inc.,
    903 F. Supp. 329 (S.D.N.Y. 1995) ..............................................................................4, 11

Jordan v. Verizon Corporation,
    2007 U.S. Dist. LEXIS 94367 (S.D.N.Y. Dec. 27, 2007) ......................................................10

Kolan v. Csengeri,
    268 F. 2d 239 (2d Cir. 1959)..............................................................................................7

Liu v. Kinokuiya Company, Ltd.,
    2005 U.S. App. LEXIS 29064 (2d Cir. Dec. 29, 2005) ...........................................4, 10, 11

Lok Prakashan, Ltd v. India Abroad Publications, Inc.,
    2004 U.S. App. LEXIS 7277 (2d Cir. April 13, 2004) ..........................................................4

Matter of Arbitration Between Karaha Bodas Company, L.L.C. v. Perusahaan
Pertambangan Minyak Dan Gas Bumi Negara,
    465 F. Supp. 2d 283 (S.D.N.Y. 2006)..................................................................................5

Motorola Credit Corp. v. Uzan,
    561 F. 3d 123 (2d Cir. 2009)..............................................................................................3

Paddington Partners v. Bouchard,
    34 F. 3d 1132 (2d Cir. 1994)..............................................................................................4

Scherer v. City of New York,
    2007 U.S. Dist. LEXIS 68139 (S.D.N.Y. Sept. 7, 2007).................................................4, 5, 11

Sea Trade Company Ltd. v. FleetBoston Financial Corp.,
    2009 U.S. Dist. LEXIS 114888 (S.D.N.Y. Dec. 9, 2009) ....................................................4, 5

Sevenson Environmental Services, Inc. v. Shaw Environmental, Inc.,
    246 F.R.D. 151 (W.D.N.Y. 2007)....................................................................................8, 11

Skinner v. Chapman,
    680 F. Supp. 2d 470 (W.D.N.Y. 2010) .............................................................4, 11

State Street Bank and Trust Company v. Inversiones Errazuriz Limitada,
    374 F. 3d 158 (2d Cir. 2004)..........................................................................5

United States of America v. International Brotherhood of Teamsters,
    247 F. 3d 370 (2d Cir. 2001)..........................................................................4

United States v. Potamkin Cadillac Corp.,
    697 F. 2d 491 (2d Cir. 1983)..........................................................................5

Westerly Electronics Corporation v. Walter Kidde & Company, Inc.,
    367 F. 2d 269 (2d Cir. 1966)..........................................................................7

Wolff v. Rare Medium, Inc.,
    210 F. Supp. 2d 490 (S.D.N.Y. 2002)...............................................................9

## OTHER AUTHORITIES

Fed. R. Civ. P. 60(b)(2)......................................................................................4

Fed. R. Civ. P. 60(b)(3)......................................................................................5

Fed. R. Civ. P. 62.1..........................................................................................3

## INTRODUCTORY STATEMENT

Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") and Merrill Lynch Capital Services, Inc. ("MLCS") respectfully submit this Memorandum of Law in opposition to the motion of Plaintiff Marc Bonnant to (i) vacate this Court's May 18, 2010 judgment pursuant to Rule 60(b)(2) and (3) of the Federal Rules of Civil Procedure; or (ii) in the alternative modifying said judgment to remove any reference to any misrepresentation made by Mr. Bonnant, relieving him from the obligation to arbitrate with MLCS, or permitting discovery on the issues raised by this motion.  In the May 18, 2010 judgment -- which is now on appeal before the Second Circuit -- this Court entered summary judgment in favor of Defendants on Plaintiff's Complaint to enjoin Defendants' Third Party Claims against Plaintiff in the Sophin Arbitration and compelled Plaintiff to arbitrate those claims.  Plaintiff has failed to demonstrate any basis under either Rule 60(b)(2) or (3) for vacating the judgment or modifying any portion thereof.  First, the Declarations of Ezequiel Nasser and Claudia Srour Buch and standing letters of authorization which Plaintiff contends show that Merrill Lynch "did not believe [Plaintiff] was the owner of the Sophin account" (Pl. Mem. at 1) are qualitatively no different than the evidence that was before this Court on the motion for summary judgment and to compel arbitration.  In other words, these materials are at best cumulative of other evidence that this Court considered and rejected in adjudicating this motion.  As such, the Nasser and Buch Declarations and standing letters of authorization do not constitute "newly discovered evidence" for purposes of Rule 60(b)(2).  Second, this Court did not base its decision on whether Merrill Lynch "believe[d] that Mr. Bonnant was the owner of the Sophin account"  (Pl. Mem. at 1). Rather, this Court granted summary judgment and compelled arbitration because it concluded that (i) the ICMA Agreement containing the arbitration provisions which Mr. Bonnant signed is

not ambiguous; and (ii) Mr. Bonnant signed the ICMA Agreement in both a representative capacity and an individual capacity. As a result, the Nasser and Buch Declarations and standing letters of authorization would not have changed the outcome of the motion. Third, Plaintiff's contention that Defendants procured the May 18, 2010 judgment by fraud is without foundation. Plaintiff has failed to demonstrate any evidence that Defendants' submissions to this Court contained material misrepresentations, let alone the clear and convincing evidence necessary under Rule 60(b)(3), or that those submissions somehow prevented Plaintiff from fully and fairly presenting his case. As no basis exists under Rule 60(b) to vacate or otherwise modify the May 18, 2010 judgment, Plaintiff's motion should be denied.

## STATEMENT OF FACTS

In light of this Court's intimate familiarity with the facts of this case, Defendants incorporate by reference their Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 along with the Statement of Facts set forth in their Memorandum of Law in support of the motion for summary judgment and to compel arbitration rather than restating those facts herein.

## ARGUMENT

## POINT I

## THIS COURT SHOULD DENY PLAINTIFF'S MOTION TO VACATE OR OTHERWISE MODIFY THE MAY 18, 2010 JUDGMENT

Plaintiff's motion to vacate or otherwise modify this Court's May 18, 2010 judgment pursuant to Rule 60(b)(2) and (3) is without legal or factual merit. The so-called newly discovered evidence upon which Plaintiff bases the instant motion is substantively identical to, and therefore cumulative of, other evidence relating to whether Merrill Lynch was on notice that

Sophin was allegedly owned by Camelia de Kassin and not Mr. Bonnant that Plaintiff submitted to this Court in opposing summary judgment. Moreover, this Court did not grant Defendants summary judgment and compel arbitration based on whether Merrill Lynch allegedly knew Mr. Bonnant was not the owner of Sophin. Rather, judgment was entered in favor of Defendants because Mr. Bonnant signed the unambiguous ICMA Agreement both individually and on behalf of Sophin. Finally, there were no misrepresentations contained in any of Defendants' submissions to this Court, nor has Plaintiff shown that Defendants prevented him from fully and fairly presenting his case.

Boiled to its essence, Plaintiff's motion is nothing more than an attempt at relitigating the merits of the motion for summary judgment and to compel arbitration. Rule 60(b), however, does not allow Plaintiff to obtain a second bite at the apple. Accordingly, Plaintiff's motion to vacate or otherwise modify the May 18, 2010 judgment should be denied.

### A. Plaintiff Has Failed to Establish Grounds for Vacating or Otherwise Modifying The May 18, 2010 Judgment Under Either Rule 60(b)(2) or (3).

Plaintiff has appealed the May 18, 2010 judgment which he now seeks to vacate or otherwise modify. While Rule 62.1 of the Federal Rules of Civil Procedure permits the district court to issue an indicative ruling on a motion for relief that is otherwise barred by virtue of a pending appeal (Fed. R. Civ. P. 62.1 (2010)), the motion for relief filed by Plaintiff herein is without legal or factual merit. As a result, Plaintiff cannot use Rule 62.1 as a vehicle to seek relief from the judgment now on appeal before the Second Circuit.

Rule 60(b) of the Federal Rules of Civil Procedure provides "'a mechanism for extraordinary judicial relief [available] only if the moving party demonstrates exceptional circumstances…,' and relief under the rule is discretionary…." Motorola Credit Corp. v. Uzan, 561 F. 3d 123, 126 (2d Cir. 2009) (quoting Ruotolo v. City of New York, 514 F. 3d 184, 191 (2d

Cir. 2008)).  Relief from a judgment under Rule 60(b) is thus "generally not favored…."  United

States of America v. International Brotherhood of Teamsters, 247 F. 3d 370, 391 (2d Cir. 2001);

Paddington Partners v. Bouchard, 34 F. 3d 1132, 1142 (2d Cir. 1994).  Accordingly, the evidence

in support of a Rule 60(b) motion must be "highly convincing."  Scherer v. City of New York,

2007 U.S. Dist. LEXIS 68139, **9-10 (S.D.N.Y. Sept. 7, 2007); Gonzalez v. Gannett Satellite

Information Network, Inc., 903 F. Supp. 329, 331 (S.D.N.Y. 1995) (same).  Moreover, "a Rule

60(b) motion cannot be used to relitigate the merits."  Liu v. Kinokuiya Company, Ltd., 2005

U.S. App. LEXIS 29064, *2 (2d Cir. Dec. 29, 2005) (summary order); Lok Prakashan, Ltd v.

India Abroad Publications, Inc., 2004 U.S. App. LEXIS 7277, **2-3 (2d Cir. April 13, 2004)

(summary order); Skinner v. Chapman, 680 F. Supp. 2d 470, 478 (W.D.N.Y. 2010).  Here,

Plaintiff predicates his motion for relief from the May 18, 2010 judgment on subsections (2) and

(3) of Rule 60(b).  As detailed infra, neither of these provisions provide a basis for vacating or

otherwise modifying the judgment.

Rule 60(b)(2) permits a court to "relieve a party … from a final judgment…." based on

"newly discovered evidence that, with reasonable diligence, could not have been discovered in

time to move for a new trial under Rule 59(b)."  Fed. R. Civ. P. 60(b)(2) (2010).  A party seeking

to vacate a judgment under Rule 60(b)(2) "has an onerous standard to meet."  International

Brotherhood of Teamsters, 247 F. 3d at 392.  The moving party must demonstrate that:

> (1) The newly discovered evidence was of facts that existed
> at the time of trial or other dispositive proceeding, (2) the
> movant must have been justifiably ignorant of them despite
> due diligence, (3) the evidence must be admissible and of
> such importance that it probably would have changed the
> outcome, and (4) the evidence must not be merely
> cumulative or impeaching.

Id. at 392; Sea Trade Company Ltd. v. FleetBoston Financial Corp., 2009 U.S. Dist. LEXIS

114888, **21-22 (S.D.N.Y. Dec. 9, 2009).  Further, the evidence presented by the moving party

must be "truly newly discovered or … could not have been found by due diligence." United States v. Potamkin Cadillac Corp., 697 F. 2d 491, 493 (2d Cir. 1983). "Evidence which was in the possession of a party prior to judgment does not constitute 'newly discovered evidence' for the purposes of Rule 60(b)(2)." Sea Trade, 2009 U.S. Dist. LEXIS 114888 at *22.

Rule 60(b)(3) permits a judgment to be vacated on the grounds of "fraud…, misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3) (2010). As the Second Circuit has confirmed, "a Rule 60(b)(3) motion cannot be granted absent clear and convincing evidence of material misrepresentations…." Fleming v. New York University, 865 F. 2d 478, 484 (2d Cir. 1989). Moreover, the moving party "'must show that the conduct complained of prevented the moving party from fully and fairly presenting his case.'" State Street Bank and Trust Company v. Inversiones Errazuriz Limitada, 374 F. 3d 158, 176 (2d Cir. 2004) (quoting Taylor v. Texgas Corp., 831 F. 2d 255, 259 (11th Cir. 1987)); Matter of Arbitration Between Karaha Bodas Company, L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 465 F. Supp. 2d 283, 293 (S.D.N.Y. 2006); Scherer, 2007 U.S. Dist. LEXIS 68139 at *15 (holding that "[t]o be entitled to relief under Rule 60(b)(3), the movant must show misconduct by clear and convincing evidence and that the misconduct substantially interfered with the movant's ability to present the case fully and fairly").

Here, neither Rule 60(b)(2) or (3) provide Plaintiff with any basis for vacating or otherwise modifying the May 18, 2010 judgment. First, the Nasser and Buch Declarations and standing letters of authorization do not constitute newly discovered evidence for purposes of Rule 60(b)(2). Instead, these materials are substantively identical to the evidence that Plaintiff submitted to this Court in opposing summary judgment. Among other things, Plaintiff cited the following evidence to show that Merrill Lynch allegedly knew Mr. Bonnant was not the owner

of Sophin and that therefore Mr. Bonnant did not make any misrepresentation to Merrill Lynch

regarding the identity of Sophin's actual beneficial owner:

1. "The fact that Merrill Lynch did not ask Mr. Bonnant for a W-8 BEN indicates that Merrill Lynch never viewed him as an account holder." (8-15-09 Pl. Mem. at 14);

2. "Mr. Bonnant never provided any personal financial information to Merrill Lynch, and none was requested from him." (8-15-09 Pl. Mem. at 14);

3. "Merrill Lynch, specifically through Claudia Srour Buch, knew that Sophin was not Mr. Bonnant's personal account. As set forth in the Declaration of [Camelia] de Kassin, dated August 11, 2009, Ms. Buch had many contacts with Ms. Kassin over the years, knew of the ownership of the account. Kassin Decl. ¶7 ('Ms. Buch visited my house on several occasions for Shabbat dinner and, based on my conversations with her, fully understood the structure of Sophin including my beneficial ownership and Mr. Bonnant's role as director and president.')" (8-15-09 Pl. Mem. at 21);

4. "Consistent with Merrill Lynch's knowledge that Mr. Bonnant did not own any of the three accounts, Jacques Nasser arranged the only face-to-face meeting with Ms. Buch that Mr. Bonnant ever had." (8-15-09 Pl. Mem. at 21);

5. "[T]he fact that Merrill Lynch knew about the LBA inspection and knew or should have known what one is, Merrill Lynch knew, at minimum, that the Sophin account belonged to someone other than [Mr. Bonnant]." (8-15-09 Pl. Mem. at 23); and

6. "Mr. Bonnant could not possibly have conducted [the trading activity in the Sophin account] (and also in the multi-million dollar Opalgreen and Artonis accounts) and maintained his other duties, including a busy law practice, serving 200 other accounts, and at times serving as the head or Bâtonnier of the Geneva Bar." (8-15-09 Pl. Mem. at 23).

See also Declaration of Camelia de Kassin dated August 11, 2009, ¶ 7 ("Ms. Buch had personal

knowledge that I, not Mr. Bonnant, was the beneficial owner of Sophin"); Declaration of Jacques

Nasser dated August 13, 2009, ¶¶ 5-6 ("The beneficial ownership of Opalgreen was known to

Merrill Lynch from the outset.  Mr. Bonnant had nothing to do with choosing to open the

brokerage accounts at Merrill Lynch … I dealt with Merrill Lynch's financial advisor, Claudia

Srour, and informed her of the ownership of Opalgreen … [I]t was understood by Ms. Srour and

the other Merrill Lynch employees that Mr. Bonnant was not the beneficial owner of Opalgreen"); Declaration of Marc Bonnant dated August 13, 2009, ¶ 31; Declaration of Corinne Corminboeuf-Harari dated August 14, 2009, ¶¶ 24-25 (the De Kassin, Jacques Nasser, Bonnant and Corminboeuf-Harari Declarations are hereinafter collectively referred to as the "August 2009 Declarations").   Like the Nasser and Buch Declarations and standing letters of authorization, the August 2009 Declarations purported to demonstrate Merrill Lynch's alleged knowledge that Plaintiff was not the owner of Sophin.  On this point, the Nasser and Buch Declarations and standing letters of authorization are qualitatively the same as the August 2009 Declarations.   In other words, Plaintiffs' so-called "newly discovered evidence" is in fact cumulative of other substantively identical evidence that was considered and rejected by this Court in granting summary judgment and compelling arbitration.  As a result, the Nasser and Buch Declarations and standing letters of authorization do not constitute "newly discovered evidence" for purposes of Rule 60(b)(2).  See Westerly Electronics Corporation v. Walter Kidde & Company, Inc., 367 F. 2d 269, 270 (2d Cir. 1966) (denying plaintiff's motion to vacate settlement order pursuant to Rule 60(b)(2), Second Circuit held that sheet of scratch paper containing allegedly false statements upon which motion was based "would have been at best cumulative...."); Kolan v. Csengeri, 268 F. 2d 239, 240 (2d Cir. 1959) (affirming district court's denial of plaintiff's motion to vacate judgment based on newly discovered evidence, Second Circuit held that "as pointed out by the trial judge, the newly discovered evidence is merely cumulative").

Second, the Nasser and Buch Declarations and standing letters of authorization would not have changed the outcome of the motion for summary judgment and to compel arbitration because this Court's decision was not founded on whether Merrill Lynch allegedly knew Mr.

Bonnant was not the owner of Sophin. Instead, this Court granted Defendants summary judgment and compelled arbitration because it concluded that (i) the ICMA Agreement containing the arbitration provisions which Mr. Bonnant signed is not ambiguous; and (ii) Mr. Bonnant signed the Agreement in both a representative capacity and in an individual capacity. See 5-11-10 Transcript at 23:4-24:3 (Exhibit 1). Merrill Lynch's alleged knowledge as to whether Mr. Bonnant was in fact the owner of Sophin thus had no bearing on this Court's decision to grant summary judgment. As a result, the Nasser and Buch Declarations and standing letters of authorization would not have changed that decision. See Boule v. Hutton, 328 F. 3d 84, 95 (2d Cir. 2003) (affirming district court's order denying plaintiffs' motion to vacate judgment pursuant to Rule 60(b)(2), holding inter alia that "the evidence proffered by plaintiffs in support of this motion … would not in any event have changed the decision at trial…."); Casella v. Equifax Credit Information Services, 56 F. 3d 469, 476 (2d Cir. 1995) (affirming district court's order denying plaintiff's motion pursuant to Rule 60(b)(2) to vacate summary judgment in favor of defendants on plaintiff's claim for violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., holding that the district court did not abuse its discretion in rejecting plaintiff's motion on the ground that "the evidence offered, even if 'newly discovered,' would not have resulted in a different outcome on summary judgment"); Sevenson Environmental Services, Inc. v. Shaw Environmental, Inc., 246 F.R.D. 151, 153 (W.D.N.Y. 2007) (denying plaintiff's motion pursuant to Rule 60(b)(2) to vacate summary judgment in favor of defendant on plaintiff's claim that defendant's hazardous waste remediation work at a lead-contaminated site infringed on plaintiff's patents, district court held that plaintiff had failed to establish that the newly discovered evidence would have changed the outcome).

Plaintiff's argument that "[c]entral to Merrill Lynch's motion for summary judgment was its assertion that Mr. Bonnant was 'the only person that Merrill Lynch knew of in connection with the Sophin Account'" (Pl. Mem. at 4) is without foundation.  Defendants' argument that Mr. Bonnant was estopped from avoiding arbitration of Merrill Lynch's claims by virtue of the alleged misrepresentations detailed in Defendants' moving papers was clearly secondary to Defendants' primary argument that Plaintiff is required to arbitrate because he signed the ICMA Agreement (among other documents) in both an individual capacity as well as in a representative capacity on behalf of Sophin.  In this regard, the dual signature point is the first point set forth in the Argument section of Defendants' initial Memorandum of Law (following the explication of the standard for summary judgment); nearly seven pages of argument are devoted to this point. See 7-24-09 Def. Mem. at 13-19.  By contrast, the misrepresentation point got less than two pages.  See 7-24-09 Def. Mem. at 19-20.  Far from "undergird[ing]" the dual signature point (Pl. Mem. at 4), Defendants' argument that Mr. Bonnant was "the only person that Merrill Lynch knew of in connection with the Sophin Account" stood on its own as an ancillary point, separate and apart from the former.

Third, there is no evidence at all that the May 18, 2010 judgment was procured by fraud. It is axiomatic that to prove fraud or misrepresentation, Plaintiff must demonstrate inter alia that Defendants made a false misrepresentation about a material fact and that Defendants knew the representation was false.  See, e.g., Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 499 (S.D.N.Y. 2002). There is nothing in either the Nasser or Buch Declarations or the standing letters of authorization which demonstrate that the Declaration of Anthony Campbell contains any materially false statements that Mr. Campbell knew to be false or that the exhibits annexed to his Declaration were in any way "bogus and … falsified" (Pl. Mem. at 5).  All that Plaintiff

has shown is that the Nasser and Buch Declarations and the Campbell Declaration diverge with respect to the beneficial ownership of the Sophin account and Merrill Lynch's constructive knowledge of same.   That Ms. Buch claims the Sophin account was purportedly owned by Ezequiel Nasser while the Artonis account was allegedly owned by Mrs. de Kassin hardly constitutes evidence of knowingly and materially false statements on the part of Mr. Campbell.

Nor has Plaintiff demonstrated misconduct by Defendants that substantially interfered with Plaintiff's ability to present his case fully and fairly.   As detailed above, Plaintiff presented the same type of evidence in opposition to the motion for summary judgment and to compel arbitration to show that Merrill Lynch allegedly knew Mr. Bonnant was not the actual owner of Sophin that he has presented on the instant motion.   See Declaration of Camelia de Kassin dated August 11, 2009, ¶ 7; Declaration of Jacques Nasser dated August 13, 2009, ¶¶ 5-6; Declaration of Marc Bonnant dated August 13, 2009, ¶ 31; Declaration of Corinne Corminboeuf-Harari dated August 14, 2009, ¶¶ 24-25.   Plaintiff has not pointed to any act or statement on the part of Defendants  which prevented Mr. Bonnant from fully and fairly presenting his case to this Court.

Plaintiff has presented nothing more than conclusory allegations of fraud by Defendants in procuring the May 18, 2010 judgment, completely devoid of any evidentiary support.   Such allegations are woefully inadequate to satisfy Plaintiff's burden under Rule 60(b)(3) of demonstrating clear and convincing evidence of fraud.   See Liu, 2005 U.S. App. LEXIS 29064 at *2 (affirming district court's denial of plaintiff's motion pursuant to Rule 60(b)(3) to vacate judgment dismissing her copyright infringement claims, Second Circuit held that plaintiff's motion "merely labeled several of defendants' trial maneuvers as fraudulent, neither explaining, or providing support as to why these maneuvers were fraudulent, or providing evidence in support"); Jordan v. Verizon Corporation, 2007 U.S. Dist. LEXIS 94367, * 11 (S.D.N.Y. Dec.

27, 2007) (denying plaintiff's motion pursuant to Rule 60(b)(3), district court held that "[a] review of the record reveals no evidence to support plaintiff's claim that defendant engaged in any behavior that would rise to the level of fraud" and that "[c]onclusory allegations of fraud alone are not sufficient to overcome plaintiff's Rule 60(b)(3) burden to specifically show misrepresentation, fraud, or misconduct by clear and convincing evidence"); Scherer, 2007 U.S. Dist. LEXIS 68139 at **16-17 (denying plaintiffs' motion pursuant to Rule 60(b)(3), district court held that defense counsel's actions in selectively providing the court with information concerning defendant's indemnification practice did not "substantially interfere" with plaintiffs' ability to present their case, as "Defendants did nothing that the Court is aware of to prevent Plaintiffs from obtaining discovery regarding the City's indemnification practices"); Gonzalez, 903 F. Supp. at 333 (denying plaintiff's motion pursuant to Rule 60(b)(3) for relief from decision granting defendants summary judgment, district court held that the plaintiff "is attempting, to a considerable extent, to use her motion for relief from judgment to relitigate the merits of her claims of discrimination" and that plaintiff's "allegations of fraud … have not been substantiated with clear and convincing evidence").

Plaintiff isn't really seeking to vacate the May 18, 2010 judgment based on newly discovered evidence and fraud, as there is none of either. Instead, Plaintiff is improperly seeking to re-litigate the merits of the motion for summary judgment and to compel arbitration. The courts in the Second Circuit have repeatedly made clear that Rule 60(b) cannot be used for this purpose. See Liu, 2005 U.S. App. LEXIS 29064 at *2; Skinner, 680 F. Supp. 2d 470 at 478; Sevenson, 246 F.R.D. at 153.

The so-called "new evidence that Merrill Lynch always knew that Mr. Bonnant and Sophin were not 'one and the same' but rather completely different" (Pl. Mem. at 6) is thus the

same as the old evidence, and in any event would not have changed the outcome of the motion for summary judgment and to compel arbitration.   No basis thus exists under Rule 60(b) for relief from this Court's judgment.   As a result, the motion to vacate or otherwise modify the May 18, 2010 judgment should be denied.

## **CONCLUSION**

For the reasons set forth herein, this Court should deny Plaintiff's motion pursuant to Rule 60(b)(2) and (3) to vacate or otherwise modify the May 18, 2010 judgment.

Respectfully submitted,

BRESSLER, AMERY & ROSS, P.C.
Attorneys for Defendants-Appellees Merrill Lynch Pierce, Fenner and Smith Incorporated and Merrill Lynch Capital Services, Inc.

By:      */s/ David J. Libowsky*
         David J. Libowsky
         17 State Street, 34th Floor
         New York, New York 10004
         212-425-9300

Dated:  New York, New York
        December 17, 2010

# EXHIBIT 1

# In The Matter Of:

*MARC BONNANT, v.*
*MERRILL LYNCH,*

---

*May  11, 2010*

---

*CONFERENCE*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 05b1bona.txt, Pages 1-25

**Word Index included with this Min-U-Script®**

**This Page Intentionally Left Blank**

MARC BONNANT, v.
MERRILL LYNCH,

[1]     (In open court)
[2]     (Case called)
[3]     THE CLERK:  For the plaintiff?
[4]     THE COURT:  Plaintiff, that's you.
[5]
[6]
[7]
[8]     And for the defense?
[9]
[10]    from Dressler, Amery & Ross for defendants.
[11]
[12]    MR. LIBOWSKY:  Good afternoon.
[13]    MR. EVANGELISTA:  Good afternoon.
[14]
[15]
[16]
[17]
[18]    right?
[19]    MR. LIBOWSKY:  And to compel arbitration.
[20]
[21]
[22]    the case on ice?
[23]
[24]
[25]

[1] but I think logically, under the facts here, the alchemy it
[2] would end up achieving is dismissal of the case and compelling
[3] arbitration, but I guess it's possible you could do the former.
[4]     THE COURT:  All right.  Well, it's your motion.
[5] Mr. Libowsky, so I suppose you should go first.  I mean, I
[6] issued an opinion last June, I guess it was, on this, but it
[7] was a different issue, of course.  It was an issue that was on
[8] plaintiff's motion for preliminary injunction, and so most of
[9] the opinion was dedicated to the issue of whether or not there
[10] is a likelihood of success on the merits given the documents
[11] that were part of the record, and so I've written on that.
[12] It's a different standard here; right?  The standard here is
[13] that there can be no disputed issue of fact.
[14]     MR. LIBOWSKY:  Right.
[15]     THE COURT:  Otherwise, your motion would not be
[16] appropriate.
[17]     MR. LIBOWSKY:  Right.  That's right, your Honor.
[18]     THE COURT:  So you've seen Mr. Hoffman's papers and
[19] the attachments, and the 56.1 statement.  So you see what he's
[20] asserting are disputed issues of fact.
[21]     MR. LIBOWSKY:  I understand.
[22]     THE COURT:  So I'd ask you to address that.
[23]     MR. LIBOWSKY:  Absolutely.  Your Honor, I think what
[24] the plaintiff is trying to do is create a smokescreen of
[25] purported facts, but if you cut through it, most of these

[1] purported factual issues are really issues that the arbitrators
[2] would have to end up resolving in the arbitration ultimately to
[3] find whether Mr. Bonnant would be liable under third-party
[4] claims of indemnification.
[5]     THE COURT:  Right.  I agree with you there.  There's a
[6] difference between liability, ultimately, and arbitrability.
[7] And so the only inquiry before me is whether there are disputed
[8] issues of fact with respect to whether or not Mr. Bonnant
[9] agreed to arbitrate.
[10]     MR. LIBOWSKY:  That's correct.
[11]     THE COURT:  And so the relevant document is the ICMA;
[12] is that right?
[13]     MR. LIBOWSKY:  Yes, the ICMA agreement.
[14]     THE COURT:  Which, well, I think we all have this
[15] memorized and could pull this up in our brain at any time of
[16] the day.
[17]     You know, we have an agreement that is dated -- I
[18] guess it's November 12th of 2001 or December 11th of 2001?
[19]     MR. LIBOWSKY:  I think Mr. Bonnant explained the
[20] dating was European style, so I think it's December 11th,
[21] 2001.
[22]     THE COURT:  Well, that may be.  I'm just going by
[23] what's on the document.  So --
[24]     MR. LIBOWSKY:  Sure.
[25]     THE COURT:  You're right.  Page 6 of 14 says 11 of

**Page 5**

[1] December of that document. But in any event, we have a page
[2] that begins, "By signing below, I acknowledge: 1. That in
[3] accordance with paragraph 8 of the agreement, I am agreeing in
[4] advance to arbitrate any controversies which may arise with
[5] you," and it's signed by Mr. Bonnant, one, in a corporate
[6] capacity and then a second time below, same date, same
[7] signature. Now there's an affidavit or a declaration that
[8] indicates that it's a stamp. I'm not sure. It wasn't clear to
[9] me that it was a stamp, just looking at it, but in any event,
[10] that's what's in the affidavit.
[11]     **MR. LIBOWSKY:** Yes. Well, just as a very relevant
[12] minor point, briefly, I don't know that it's Mr. Bonnant -- his
[13] personal knowledge as to whether that was a stamp or actually
[14] signed it. I mean, I think he said that he, you know, he would
[15] delegate having his secretary put -- affix his signature by way
[16] of stamp on documents but he couldn't say -- he didn't say in
[17] his declaration that the secretary affixed a stamp on this
[18] occasion.
[19]     **THE COURT:** Well, I'm not sure, because, "On or about
[20] December 11th --" this is paragraph 10 of his declaration
[21] "-- at the request of Merrill Lynch, who sent it to me, I
[22] signed the ICMA agreement in blank. As a matter of fact, the
[23] signing of that document, as well as the others, has been done
[24] at my instruction by my secretary with a stamp bearing my
[25] signature." That seems to be specific to that document.

**Page 6**

[1]     **MR. LIBOWSKY:** Okay.
[2]     **THE COURT:** I think there's another paragraph in here
[3] where he talks about a general practice of using a stamp or his
[4] secretary using a stamp --
[5]     **MR. LIBOWSKY:** Right.
[6]     **THE COURT:** -- but I took paragraph 10 to be a
[7] specific recollection of that document being stamped.
[8]     **MR. LIBOWSKY:** Okay.
[9]     **THE COURT:** Anyway, I'm not sure it matters. He
[10] clearly would acknowledge that he directed that it be used.
[11]     **MR. LIBOWSKY:** I would think so.
[12]     Your Honor, the very narrow issues before you for
[13] which I believe all these so-called factual issues are, again,
[14] a smokescreen, really limit it to the authenticity of the
[15] signatures, and there's no disputing there's the authenticity.
[16] Whether this is an actual signature or a stamp of a signature,
[17] no question, no disputes, as Mr. Bonnant signed these
[18] documents, he has said so, and there's no dispute as to the
[19] authenticity of the preprinted text of the ICMA agreement,
[20] which was in the document before he ever signed it, leaving
[21] aside whether the document was signed in blank or was filled
[22] in. I don't think it matters for purposes of whether there's
[23] any genuine issue of material fact. He signed the document
[24] twice, and I think as you pointed out in your opinion, he
[25] signed it as a separate account holder, which is the second

**Page 7**

[1] signature.
[2]     So what are the legal consequences of that under New
[3] York law? Well, New York law is very clear that you look --
[4] you have an objective test to determine whether the parties
[5] entered into a contract, as dealt with by the New York Court of
[6] Appeals in the Mencher v. Weiss case, to which we cited, and
[7] that's 306 NY 1, a 1953 decision. And, you know, they made it
[8] clear that you looked at it -- you employed a subjective test
[9] for the manifestation -- and I'm quoting -- "the manifestation
[10] of a party's intention rather than the actual or real intention
[11] ordinarily controlling."
[12]     **THE COURT:** Well, the issue is whether there's an
[13] ambiguity in this document; right?
[14]     **MR. LIBOWSKY:** Well --
[15]     **THE COURT:** And so, I mean, on page 1 of the document
[16] it lists Sophin Investments as the primary account holder name,
[17] I think. It's hard to read.
[18]     **MR. LIBOWSKY:** That's what I think, Judge.
[19]     **THE COURT:** I think there's a blank form that's been
[20] attached as Exhibit 5 of Mr. Hoffman's declaration. Well, to
[21] Mr. Bonnant's declaration submitted in connection with
[22] Mr. Hoffman's brief. But it's Exhibit 5. So it's easier to
[23] read than what is in bold in the text of the agreement.
[24]     All right. But so for account information, it says,
[25] "Primary Account Holder Name, Sophin Investments," and then

**Page 8**

[1] it's blank on the second line, "Additional Account Holders."
[2] So is there an ambiguity between page 4, which has signatures
[3] of both Mr. Bonnant in a corporate capacity and Mr. Bonnant as
[4] what appears to be an account holder or on a line that says
[5] account holder, and what's on page 1?
[6]     **MR. LIBOWSKY:** There's no ambiguity whatsoever, your
[7] Honor.
[8]     **THE COURT:** Why do you say that?
[9]     **MR. LIBOWSKY:** This is a personal investment
[10] holding -- personal holding company. That's what Sophin is.
[11] So simply put, it's just a company that's organized to hold a
[12] person -- an individual's personal assets. It's -- there's
[13] nothing wrong with setting up a personal holding company, but
[14] all it is is just a company to hold your assets. So while he
[15] may have opened this in the name of Sophin Investments, the
[16] holder of the assets, which Merrill Lynch understood to be
[17] Mr. Bonnant, is really the account holder. They're one and the
[18] same. So there's no ambiguity between the fact that he signed
[19] this document twice and the fact that the primary account
[20] holder is Sophin Investments. Why is that? Because he signed
[21] in a representative capacity initially, because Sophin
[22] Investment is the account -- the named account holder, but he
[23] really is -- at least as far as Merrill Lynch can tell, in
[24] looking at it objectively, he is the holder. He is the
[25] company --

MARC BONNANT, v.
MERRILL LYNCH,

May 11, 2010

[1]     **THE COURT:** Wait a minute. I mean, on page 1, it
[2] says, under the second box, "Account Information. Please print
[3] the names of all account holders." So where is Mr. Bonnant's
[4] name?
[5]     **MR. LIBOWSKY:** His name isn't there.
[6]     **THE COURT:** Ah, okay. So on the face of page 1, who
[7] is the account holder?
[8]     **MR. LIBOWSKY:** On page 1, it's Sophin Investments.
[9]     **THE COURT:** Okay. So on page 4, it lists
[10] Mr. Bonnant's name twice, once clearly on behalf of Sophin
[11] Investments, that's the first signature, and then the second
[12] signature line, you know, presumably you would argue in the
[13] individual capacity. But is there an ambiguity between page 1
[14] and page 4?
[15]     **MR. LIBOWSKY:** Well, respectfully, your Honor, I
[16] submit there is no ambiguity because merely -- because --
[17] merely because page 1 had listed Sophin Investment as the
[18] primary account holder doesn't preclude the possibility of
[19] Mr. Bonnant being the individual owner of this company. As I
[20] said, it is a personal holding company. Perhaps -- perhaps if
[21] this was General Motors that had set up a corporation and it's
[22] signed twice by its CFO, maybe in that case it would be hard to
[23] argue that the CFO is signing -- is opening an ICMA account in
[24] his individual capacity because he obviously is not the primary
[25] shareholder, sole shareholder or may not be a shareholder of

[1]     **THE COURT:** But what?
[2]     **MR. LIBOWSKY:** Okay. I mean, I could -- if we would
[3] just get focused on -- I don't know if the Court was just
[4] focused on the ICMA agreement or the later March 26th, 2004
[5] confidential letter agreement.
[6]     **THE COURT:** Do I even need to get there? If this
[7] December 11th agreement is unambiguous, is there a need to go
[8] any place else?
[9]     **MR. LIBOWSKY:** No, there wouldn't be a need to go
[10] anywhere else, because it ought to be -- it's clear on its face
[11] and the inquiry ought to end with that agreement.
[12]     **THE COURT:** All right. So let's stop there then; all
[13] right?
[14]     Mr. Hoffman, let me hear from you. Do you agree that
[15] if this agreement is unambiguous, that's the end of the
[16] inquiry? Unambiguous with respect to the arbitrability of any
[17] of the disputes?
[18]     **MR. HOFFMAN:** Yes, I do.
[19]     **THE COURT:** All right. So then let's look at
[20] page 4 --
[21]     **MR. HOFFMAN:** Okay.
[22]     **THE COURT:** -- which I think I just read a little
[23] while ago. "By signing below --" and your client clearly
[24] signed below "-- I acknowledge that in accordance with
[25] paragraph 8 of the agreement, I am agreeing in advance to

[1] General Motors. But what we have here is a personal holding
[2] company, Sophin, its sole shareholder. That's what the nature
[3] of this vehicle is. So while on the face of the first page of
[4] the agreement, it may --
[5]     **THE COURT:** Where is there anything in this agreement
[6] that talks about who the sole shareholder is?
[7]     **MR. LIBOWSKY:** Well, there isn't, there isn't, but I
[8] think that's based on the pleadings that have been attached as
[9] exhibits. I mean, Sophin's statement of claims -- I mean, the
[10] pleadings, if your Honor -- are such that Sophin had said --
[11] Sophin in the arbitration had said that Ms. DeKassin is the
[12] sole shareholder. We have said in our counterclaim and our
[13] third-party complaint that the information that we had was that
[14] Mr. Bonnant was the sole shareholder of this entity and the
[15] only person who had anything to do with it. So --
[16]     **THE COURT:** All right. But I thought you wanted me
[17] not to stray from the document.
[18]     **MR. LIBOWSKY:** No, I don't want you to stray from the
[19] document.
[20]     **THE COURT:** So what does the document say, if
[21] anything, about who the sole shareholder is?
[22]     **MR. LIBOWSKY:** It doesn't -- it does not, I believe,
[23] list anything about the shareholders in this document.
[24]     **THE COURT:** Yes. I didn't think it did.
[25]     **MR. LIBOWSKY:** No. But --

[1] arbitrate any controversies which may arise with you."
[2] Paragraph 8 of the agreement, Which is at page 8 of 14, just --
[3]     **MR. HOFFMAN:** Yes. I agree with you. I would say
[4] that the -- I mean, I think it's as the Court suggested, that
[5] the fact that, according to my client -- I mean, this document
[6] says that it's a corporate account; doesn't say it's a personal
[7] account. That box is checked only for corporate. It only
[8] lists the name of Sophin Investments as the account holder.
[9] And as you -- as the Court pointed out, there is a line for
[10] additional account holders, and my client's name does not
[11] appear there. And even if -- even if he were the sole
[12] shareholder -- the shareholder is actually not
[13] Mrs. DeKassin but a trust of which Mrs. DeKassin is a
[14] beneficiary of. Even if my client were the sole shareholder of
[15] a corporation, that doesn't make him personally liable on the
[16] corporation's accounts.
[17]     **THE COURT:** I'm not talking about personal liability.
[18] I don't care about personal liability.
[19]     **MR. HOFFMAN:** I understand.
[20]     **THE COURT:** He may not be personally liable at all. I
[21] only care whether he agreed to arbitrate.
[22]     **MR. HOFFMAN:** Correct, your Honor. But I mean, as far
[23] as -- as far as obligations under the contract to arbitrate;
[24] okay?
[25]     **THE COURT:** All right. But the language I just quoted

**Page 13**

[1] from certainly uses the first person, "I," and it talks
[2] about --
[3]    **MR. HOFFMAN:** Well, they use "I," and it's a
[4] preprinted form, and they use "I" even if -- I assume in cases
[5] where it's -- where Merrill Lynch does not contend that it's a
[6] natural person. I mean --
[7]    **THE COURT:** I'm glad you said that, because in the
[8] definitional section on page 7 of 14, it says, "In this
[9] agreement, 'I,' 'me,' 'my,' or 'account holder' means each
[10] natural or legal person who signs the international CMA account
[11] application and agreement form." That would seem to cover
[12] Mr. Bonnant as a natural person who signed the form. Doesn't
[13] necessarily say he's liable as the account holder; doesn't
[14] necessarily say he's liable as the sole shareholder. It simply
[15] says that he, by signing the form, is at the very least
[16] agreeing in advance to arbitrate any controversies which may
[17] arise with the other party to the agreement. Why isn't that
[18] the end of the story for purposes of arbitrability, not
[19] liability? You get all these arguments in arbitration and you
[20] get to persuade the arbitrator that your guy's not liable. But
[21] for arbitrability, why isn't that it?
[22]    **MR. HOFFMAN:** Because I -- and I think as I pointed
[23] out in my memo, in the First Capital case, where you had a
[24] similar thing where someone had signed three times for two
[25] corporations, said you have to look to the substance of the

**Page 14**

[1] agreement.
[2]    **THE COURT:** I've looked at the substance of the
[3] agreement. I'm looking at the page where he has signed it. It
[4] says, on the very page that he has signed, what he's agreeing
[5] to, and then the very language of the agreement that's
[6] referenced on the signature page has a definitional section
[7] that makes clear what "I," "me," "my," or "account holder"
[8] means. So I think it's very distinguishable from that case.
[9]    **MR. HOFFMAN:** I understand that.
[10]    The other point that I would -- I mean, the signature
[11] lines that are present on page 4 are exactly parallel to the
[12] structure of the page 1 of the document, where it has "Primary
[13] Account Holder, Additional Account Holder." And since there's
[14] nobody listed as the additional account holder, and --
[15]    **THE COURT:** But I'm not saying he's the account
[16] holder, necessarily. I'm saying that by signing this page, he,
[17] at the very least, agrees to arbitrate, as an individual,
[18] according to the definition of "I" in the agreement that he
[19] signed.
[20]    **MR. HOFFMAN:** Well, I mean, that -- if -- your Honor,
[21] the signature lines do not provide for corporate titles.
[22]    **THE COURT:** I didn't say it did.
[23]    **MR. HOFFMAN:** Okay. So he signed it once --
[24]    **THE COURT:** As a natural person.
[25]    **MR. HOFFMAN:** If he had only signed it once, your

**Page 15**

[1] Honor, that would come, you know, he -- within the precise
[2] words of the contract that you just read, he would be obliged
[3] to arbitrate had there only been one signature personally.
[4]    **THE COURT:** I think that might be right.
[5]    **MR. HOFFMAN:** And I don't think -- I mean, I think
[6] we've seen that the argument here revolves around there being
[7] two signatures, the theory being, once for the corporation and
[8] once for the -- once for himself personally. Now what -- the
[9] body of caselaw in New York concerning, you know, when
[10] corporate officers or directors or shareholders take on
[11] personal liability, I think that many of those cases use the
[12] word "demand."
[13]    **THE COURT:** But again, I'm not interested in personal
[14] liability at this stage. I think that's an argument for the
[15] arbitrator.
[16]    **MR. HOFFMAN:** Well, okay. Well, I mean, when I say
[17] liability -- and maybe perhaps I'm using the language a little
[18] bit imprecisely -- is to say obligation to arbitrate, whether
[19] or not there's going to be a personal obligation under this
[20] contract, whether it's to arbitrate or anything else, I think
[21] it's an identical standard.
[22]    **THE COURT:** Well, I don't know if it's the identical
[23] standard or not. It may be that account holders are liable for
[24] certain things that others who sign as natural persons are not.
[25] But in terms of arbitration, or the arbitrability of any

**Page 16**

[1] dispute, seems to me that "I" is very broad and --
[2]    **MR. HOFFMAN:** Right.
[3]    **THE COURT:** -- the signature lines expressly -- I
[4] mean, it falls right below that section relating to
[5] arbitration.
[6]    **MR. HOFFMAN:** Right.
[7]    **THE COURT:** Can I interrupt for a second. I'm sorry.
[8] But what is going on with the arbitration at this point?
[9]    **MR. HOFFMAN:** It's scheduled to begin on June 8th.
[10]    **THE COURT:** June 8th. All right. Maybe it's not
[11] fair to you. You're not as involved in this as they are in the
[12] back.
[13]    **MR. HOFFMAN:** No, no, no. The arbitration is only
[14] with this side. It's only with Sophin.
[15]    **THE COURT:** All right. But are you representing
[16] Sophin?
[17]    **MR. HOFFMAN:** No. I represent Mr. Bonnant. But I'm
[18] plugged into that. What I'm not plugged into, which they are,
[19] is the case between Ezequiel Nasser, et al. and Merrill Lynch
[20] in state court. There is -- there have been settlement
[21] discussions that seem to be going someplace, but --
[22]    **THE COURT:** I've heard that before.
[23]    **MR. HOFFMAN:** There are two sets of settlements.
[24] There's one between Merrill Lynch and everybody else, and
[25] there's one among the Nasser family members. The one among the

MARC BONNANT, v.
MERRILL LYNCH,

May 11, 2010

---

Page 17

[1] Nasser family members, which my client is not a party to and
[2] I'm not participating in those negotiations, apparently has hit
[3] some obstacles. But I think it's not out of the question that
[4] this matter could be settled. And I think that Merrill Lynch
[5] has suggested -- I think -- I think we'll know by next Tuesday.
[6] If it's not -- if it's not done by next Tuesday, I think we're
[7] off to the races.
[8]        THE COURT:  All right. Mr. Evangelista I think wanted
[9] to say something.
[10]        MR. EVANGELISTA:  The arbitration is scheduled to
[11] commence on June 8th before FINRA, and that's the Sophin
[12] arbitration against Merrill Lynch in which we third-partied
[13] against Mr. Bonnant and Mr. Ezequiel Nasser. That is still
[14] pending and scheduled to go forward subject to the family's
[15] resolving their issues by then. We gave them a drop dead date
[16] of next Tuesday. If they don't tell us there's a deal, we're
[17] going forward with everything on June 8th. That's where it
[18] stands.
[19]        THE COURT:  All right. Okay. I probably should have
[20] asked that at the outset.
[21]        MR. HOFFMAN:  So we are, you know -- so we could be --
[22] this could -- may be resolved. And if I might -- if I might
[23] hand something else up and just include this in the record on
[24] this motion -- I think Mr. Evangelista told me he's got this,
[25] which is the -- in the meantime, there has been an award in the

---

Page 18

[1] arbitration between -- there was an arbitration between
[2] Ms. Buch, the broker, and Merrill Lynch, and she was trying to
[3] get her U5 changed, and if I might hand that up.
[4]        THE COURT:  Sure. You can hand it to Mr. Buland, my
[5] law clerk.
[6]        MR. HOFFMAN:  And I would just like that included on
[7] the record on this motion.
[8]        THE COURT:  All right. I'll make it part of the
[9] record. I'm not sure what I'm going to call it. This is an
[10] award in a FINRA dispute resolution in the matter of the
[11] arbitration between Claudia S-R-O-U-R --
[12]        MR. HOFFMAN:  I believe it's "Sa-reer." That's the
[13] best I can do.
[14]        THE COURT:  -- v. Merrill Lynch, Pierce, Fenner &
[15] Smith, Inc. and Merrill Lynch & company, Inc. And the
[16] signature page, the last page is dated 3/23/10, signed by the
[17] nonpublic arbitrator, Howard L. Haykin, H-A-Y-K-I-N.
[18]        MR. HOFFMAN:  I believe these should all be signed.
[19]        THE COURT:  Yes, this is signed on separate pages, by
[20] Hiram Lazar on the second to last page, and Joel P. Mellis,
[21] M-E-L-L-I-S, on the first signature page. Okay.
[22]        MR. HOFFMAN:  I realize we're not arguing this point
[23] yet, but I would just like to -- I believe this opinion or
[24] award is relevant because Merrill Lynch apparently prevailed on
[25] a point that Ms. Srour did engage in some activity suggesting

---

Page 19

[1] that she falsified customer information on behalf of Merrill
[2] Lynch.
[3]        THE COURT:  All right. But Merrill Lynch was
[4] represented by somebody else on that; is that right?
[5]        MR. HOFFMAN:  Well, I believe Mr. Evangelista was
[6] involved in the case, or at least --
[7]        THE COURT:  All right. Well, it says Bingham
[8] McCutchen represented Merrill Lynch.
[9]        MR. EVANGELISTA:  Your Honor, Bingham McCutchen
[10] represented Merrill Lynch in the arbitration. As I told
[11] Mr. Hoffman out in the hall, we were involved in gathering
[12] documents since our firm has been involved in the bigger Nasser
[13] litigation since inception. We had nothing to do with the
[14] actual trial of the arbitration. I'm somewhat at a loss as to
[15] how this is relevant to Sophin. But she sued for $80 million
[16] and she was awarded 25,000, and she basically sued for wrongful
[17] termination, so I'm not sure how that applies or has anything
[18] to do to the application currently pending before your Honor.
[19]        THE COURT:  Well, I'm not sure either.
[20]        Mr. Hoffman, what does this have to do with any of
[21] that?
[22]        MR. HOFFMAN:  Well, I -- and I realize we may not get
[23] to this point, but as far as the arguments that I have set
[24] forth are, at least in part, that Merrill Lynch filled out
[25] documents in this account in a misleading manner. There are

---

Page 20

[1] documents that suggest that Mr. Bonnant is the account holder.
[2] And they have a grossly inflated level of his assets, his
[3] income, etc., etc., and I believe that Merrill Lynch prevailed
[4] on that point against Ms. Buch. I don't think they can come in
[5] here and then run away from her vis-à-vis my client. I mean,
[6] she was putting in bogus stuff and --
[7]        THE COURT:  Who's Ms. Buch?
[8]        MR. HOFFMAN:  That's Claudia Srour Buch.
[9]        THE COURT:  Oh, all right.
[10]        MR. HOFFMAN:  I'm sorry. She has a third name,
[11] Claudia --
[12]        THE COURT:  Okay. The agreement, what you handed out
[13] doesn't refer to her as Buch, just --
[14]        MR. HOFFMAN:  Okay. In other places she's referred to
[15] as that. I'm not positive as to what her preference was on
[16] that, how she --
[17]        THE COURT:  All right.
[18]        MR. HOFFMAN:  But as far as the ambiguity goes, I
[19] think that we can see that there was a course of dealing before
[20] the agreement was signed. Even if Merrill Lynch would like to
[21] suggest that automatically the two signatures create the
[22] liability to arbitrate, I think it's -- if we look at the
[23] declaration of Ms. McKassin and Jacques Nasser and Mr. Bonnant,
[24] the way these people came in the door to Merrill Lynch was
[25] through these various Nasser family members, and Ms. Buch knew

---

Page 21

[1] from the outset, at least according to the declarations I have
[2] submitted, that she knew it wasn't his account or he was not --
[3] it wasn't his personal -- personal money going in there.
[4]     THE COURT: Well, that may be. Again, I think that
[5] all this related to the merits of the claims relate to
[6] liability. I'm really focused just on arbitrability and --
[7]     MR. HOFFMAN: Well, I don't really have anything
[8] further on the ambiguity of the agreement. I would just point
[9] that, if we look at page 1, it appears to say there's no
[10] account holder named -- Marc Bonnant is not named as an account
[11] holder. There's two signatures. I think there's plenty of
[12] material in the record that suggests how -- that that was a
[13] mistake, how that mistake occurred, and that it was never
[14] intended to be -- he never intended to bind himself, and I
[15] don't think Merrill Lynch ever had an intention to bind him.
[16] As we see from the course of conduct afterward, although I'm
[17] not using that to create an ambiguity, I think what it shows is
[18] that Merrill Lynch never believed that Mr. Bonnant was the
[19] party responsible in any way for this account. If we look at
[20] the letter that was sent at the end, when there was an over --
[21] when there was a deficit on the account, it was only sent to
[22] Sophin. There's no letter that says, "Dear Mr. Bonnant: Your
[23] account is in deficit. Send us a check for $3 million." It
[24] doesn't say that. It says Sophin. We have the W-8 forms.
[25] They never requested one of those from Mr. Bonnant personally.

Page 22

[1] And again, I'm not -- I'm not citing this conduct to try to
[2] create an ambiguity in the original agreement but to show that
[3] it was never -- there was never a meeting of the minds of the
[4] parties that Mr. Bonnant was actually in any way accepting any
[5] responsibilities towards Merrill Lynch as an account holder, as
[6] an owner of the account, as someone obligated to arbitrate.
[7]     And also, the final piece would be the correspondence
[8] regarding the LBA examinations, and I think those show that
[9] everybody was well aware from day one that Mr. Bonnant was not
[10] an account holder, which would be the only reason for him to
[11] have signed the thing.
[12]     THE COURT: All right.
[13]     MR. HOFFMAN: That's what I have.
[14]     THE COURT: Okay. Do you want to respond at all,
[15] Mr. Libowsky?
[16]     MR. LIBOWSKY: Yeah, just briefly, your Honor.
[17]     Mr. Hoffman's protestations to the contrary
[18] notwithstanding, I think he is trying to create an ambiguity at
[19] this point to a clear document.
[20]     To go to the Court's earlier point regarding the
[21] definition, if you also look at paragraph 8 of the ICMA
[22] agreement, which is page 8 of 4 [sic], after the five bullet
[23] points, which is entitled Agreement to Arbitrate Controversies,
[24] it says, "I agree that all controversies which may arise."
[25]     THE COURT: Yes.

Page 23

[1]     MR. LIBOWSKY: So another example of the very broad
[2] use of the word "I" inclusive of a natural person, such as
[3] Mr. Bonnant.
[4]     THE COURT: All right. I'm prepared to rule.
[5]     With respect to arbitrability only -- and I want to be
[6] very clear about that -- I'm persuaded that the agreement is
[7] not ambiguous, that Mr. Bonnant signed in a representative
[8] capacity and in an individual capacity; that the agreement
[9] itself specifically provides, as I read before but I'll say it
[10] again -- why not -- "In this agreement, 'I,' 'me,' 'my,' or
[11] 'account holder' means each natural or legal person who signs
[12] the international CMA account application and agreement form;"
[13] that the form on the signature page itself actually sets forth
[14] the other language I read before, page 4 of 4, that, "I
[15] acknowledge, in accordance with paragraph 8 of the agreement, I
[16] am agreeing in advance to arbitrate any controversies which may
[17] arise with you." And paragraph 8 also provides, "I agree that
[18] all controversies which may arise between us... shall be
[19] determined by arbitration."
[20]     Based on the language of the sections I've just
[21] recited and based on the reasons set forth previously in my
[22] June 25th, 2009 order, I think arbitration is appropriate
[23] here. I think that's what was contemplated. And so I will
[24] grant the motion to compel arbitration and grant the motion for
[25] summary judgment. I'm going to grant the motion. I'll issue a

Page 24

[1] short order to that effect, but it's on the record here today
[2] and then also developed, to the extent relevant, in my June
[3] 2009 order.
[4]     Yes.
[5]     MR. HOFFMAN: And this action is dismissed?
[6]     THE COURT: Yes. Now if you need to come back here to
[7] enforce arbitration or whatever else, it will come back to me
[8] as related. But make sure, for whatever reason you come back,
[9] you file something in court and check the box "Related" and
[10] indicate this case. It would be silly to have another judge
[11] get up to speed on all of this, after all we've been through
[12] together. All right?
[13]     And my finding is with respect to both of the
[14] defendants. But MLCS I think is just for the reasons that I've
[15] developed more fully in the June 2009 order. Okay?
[16]     All right.
[17]     MR. EVANGELISTA: Thank you, your Honor.
[18]     THE COURT: Good luck with the arbitration. I have no
[19] opinion with respect to alternate liability. And if it
[20] settles, then good luck with that. I'd be curious to know if
[21] and when this happens, if it doesn't get back to me. You know,
[22] don't be shy about letting me know. I'm here in the
[23] courthouse.
[24]     ALL COUNSEL: Thank you, your Honor.
[25]     THE COURT: Thanks. I appreciate the time and effort

MARC BONNANT, v.
MERRILL LYNCH,

Page 25

[1]  that went into this for all of you, as you may know.
[2]       **ALL COUNSEL:** Thank you.
[3]       **THE COURT:** Thank you.  If you need a copy of the
[4]  transcript, you can take that up with the court reporter now.
[5]       **MR. HOFFMAN:** Okay.
[6]       **MR. EVANGELISTA:** Thanks.
[7]                    o0o
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**This Page Intentionally Left Blank**

MARC BONNANT, v.
MERRILL LYNCH,

May 11, 2010

## $

**$3** 21:23
**$80** 19:15

## |

**[sic]** 22:22

## 1

**1** 5:2;7:7,15:8:5;9:1,6,8, 13,17:14:12:21:9
**10** 5:20:6:6
**11** 4:25
**11th** 4:18,20:5:20;11:7
**12th** 4:18
**14** 4:25;12:2;13:8
**1953** 7:7

## 2

**2001** 4:18,18,21
**2004** 11:4
**2009** 23:22;24:3,15
**25,000** 19:16
**25th** 23:22
**26th** 11:4

## 3

**3/23/10** 18:16
**306** 7:7

## 4

**4** 8:2;9:9,14;11:20;14:11; 22:22;23:14,14

## 5

**5** 7:20,22
**56.1** 3:19

## 6

**6** 4:25

## 7

**7** 13:8

## 8

**8** 5:3;15:22;12:2,2;22:21, 22;23:15,17
**8th** 16:9,10;17:11,17

## A

**Absolutely** 3:23
**accepting** 22:4

**accordance** 5:3;11:24; 23:15
**according** 12:5;14:18; 21:1
**account** 6:25;7:16,24;8:4, 5,17,19,22,22;9:3,7,18,23; 12:6,7,8,10;13:9,10,13; 14:7,14,15;15:23;19:25; 20:1;21:2,10,10,19,21,23; 22:5,6,10;23:11,12
**Account** 7:25;8:1;9:2; 14:13,13
**accounts** 12:16
**achieving** 3:2
**acknowledge** 5:2;6:10; 11:24;23:15
**action** 24:5
**activity** 18:25
**actual** 6:16;7:10;19:14
**actually** 5:13;12:12;22:4; 23:13
**additional** 12:10;14:14
**Additional** 8:1;14:13
**address** 3:22
**advance** 5:4;11:25;13:16; 23:16
**affidavit** 5:7,10
**affix** 5:15
**affixed** 5:17
**afterward** 21:16
**again** 6:13;15:13;22:1; 23:10
**Again** 21:4
**against** 17:12,13;20:4
**ago** 11:23
**agree** 4:5;11:14;12:3; 22:24;23:17
**agreed** 4:9;12:21
**agreeing** 5:3;11:25; 13:16;14:4;23:16
**agreement** 4:13,17;5:3, 22;6:19;7:23;10:4,5;11:4,5, 7,11,15,25;12:2;13:9,11, 17;14:1,3,5,18;20:12,20; 21:8;22:2,22;23:6,8,10,12, 15
**Agreement** 22:23
**agrees** 14:17
**Ah** 9:6
**al** 16:19
**alchemy** 3:1
**alternate** 24:19
**although** 21:16
**ambiguity** 7:13;8:2,6,18; 9:13,16,20:18:21:8,17; 22:2,18
**ambiguous** 23:7
**among** 16:25,25
**apparently** 17:2;18:24
**Appeals** 7:6
**appear** 12:11
**appears** 8:4;21:9
**application** 13:11;19:18;

23:12
**applies** 19:17
**appreciate** 24:25
**appropriate** 3:16;23:22
**arbitrability** 4:6;11:16; 13:18,21;15:25;21:6;23:5
**arbitrate** 4:9;5:4;12:1,21, 23;13:16;14:17;15:3,18,20; 20:22;22:6;23:16
**Arbitrate** 22:23
**arbitration** 3:3;4:2;10:11; 13:19;15:25;16:5,8,13; 17:10,12;18:1,1,11;19:10, 14;23:19,22,24;24:7,18
**arbitrator** 13:20;15:15; 18:17
**arbitrators** 4:1
**argue** 9:12,23
**arguing** 18:22
**argument** 15:6,14
**arguments** 13:19;19:23
**arise** 5:4;12:1;13:17; 22:24;23:17,18
**around** 15:6
**aside** 6:21
**asserting** 3:20
**assets** 8:12,14,16;20:2
**assume** 13:4
**attached** 7:20;10:8
**attachments** 3:19
**authenticity** 6:14,15,19
**automatically** 20:21
**award** 17:25;18:10,24
**awarded** 19:16
**aware** 22:9
**away** 20:5

## B

**back** 16:12;24:6,7,8,21
**based** 10:8;23:21
**Based** 23:20
**basically** 19:16
**bearing** 5:24
**begin** 16:9
**begins** 5:2
**behalf** 9:10;19:1
**below** 5:2,6;11:23,24;16:4
**beneficiary** 12:14
**best** 18:13
**bigger** 19:12
**bind** 21:14,15
**Bingham** 19:7,9
**bit** 15:18
**blank** 5:22;6:21;7:19;8:1
**body** 15:9
**bogus** 20:6
**bold** 7:23
**Bonnant** 4:3,8,19;5:5,12; 6:17;8:3,3,17;9:19;10:14; 13:12;16:17;17:13;20:1,23; 21:10,18,22,25;22:4,9; 23:3,7

**Bonnant's** 7:21;9:3,10
**both** 8:3;24:13
**box** 9:2;12:7;24:9
**brain** 4:15
**brief** 7:22
**briefly** 5:12;22:16
**broad** 16:1;23:1
**broker** 18:2
**Buch** 18:2;20:4,7,8,13,25
**Buland** 18:4
**bullet** 22:22

## C

**call** 18:9
**came** 20:24
**can** 3:13;8:23;18:4,13; 20:4;19;25:4
**Can** 16:7
**capacity** 5:6;8:3,21;9:13, 24;23:8,8
**Capital** 13:23
**care** 12:18,21
**case** 3:2;7:6,9:22;13:23; 14:8;16:19;19:6;24:10
**caselaw** 15:9
**cases** 13:4;15:11
**certain** 15:24
**certainly** 13:1
**CFO** 9:22,23
**changed** 18:3
**check** 21:23;24:9
**checked** 12:7
**cited** 7:6
**citing** 22:1
**claims** 4:4;10:9;21:5
**Claudia** 18:11;20:8,11
**clear** 5:8;7:3,8;11:10; 14:7;22:19;23:6
**clearly** 6:10;9:10;11:23
**clerk** 18:5
**client** 11:23;12:5,14;17:1; 20:5
**client's** 12:10
**CMA** 13:10;23:12
**commence** 17:11
**company** 8:10,11,13,14, 25;9:19,20;10:2;18:15
**compel** 23:24
**compelling** 3:2
**complaint** 10:13
**concerning** 15:9
**conduct** 21:16;22:1
**confidential** 11:5
**connection** 7:21
**consequences** 7:2
**contemplated** 23:23
**contend** 13:5
**contract** 7:5;12:23;15:2, 20
**contrary** 22:17
**controlling** 7:11
**controversies** 5:4;12:1;

13:16;22:24;23:16,18
**Controversies** 22:23
**copy** 25:3
**corporate** 5:5;8:3;12:6,7; 14:21;15:10
**corporation** 9:21;12:15; 15:7
**corporations** 13:25
**corporation's** 12:16
**correspondence** 22:7
**COUNSEL** 24:24;25:2
**counterclaim** 10:12
**course** 3:7;20:19;21:16
**court** 16:20;24:9;25:4
**Court** 7:5;11:3;12:4,9
**COURT** 3:4,15,18,22;4:5, 11,14,22,25;5:9;6:2,6,9; 7:12,15,19;8:8;9:1,6,9; 10:5,16,20,24;11:1,6,12, 19,22;12:17,20,25;13:7; 14:2,15,22,24;15:4,13,22; 16:3,7,10,15,22;17:8,19; 18:4,8,14,19;19:3,7,19; 20:7,9,12,17;21:4;22:12, 14,25;23:4;24:6,18,25;25:3
**courthouse** 24:23
**Court's** 22:20
**cover** 13:11
**create** 3:24;20:21;21:17; 22:2,18
**curious** 24:20
**currently** 19:18
**customer** 19:1
**cut** 3:25

## D

**date** 5:6;17:15
**dated** 4:17;18:16
**dating** 4:20
**day** 4:16;22:9
**dead** 17:15
**deal** 17:16
**dealing** 20:19
**dealt** 7:5
**Dear** 21:22
**December** 4:18,20;5:1, 20;11:7
**decision** 7:7
**declaration** 5:7,17,20; 7:20,21;20:23
**declarations** 21:1
**dedicated** 3:9
**defendants** 24:14
**deficit** 21:21,23
**definition** 14:18;22:21
**definitional** 13:8;14:6
**DeKassin** 10:11;12:13,13
**delegate** 5:15
**demand** 15:12
**determine** 7:4
**determined** 23:19
**developed** 24:2,15

## A

**Absolutely** 3:23
**accepting** 22:4

MARC BONNANT, v.
MERRILL LYNCH,

**difference** 4:6
**different** 3:7,12
**directed** 6:10
**directors** 15:10
**discussions** 16:21
**dismissal** 3:2
**dismissed** 24:5
**dispute** 6:18;16:1;18:10
**disputed** 3:13,20;4:7
**disputes** 6:17;11:17
**disputing** 6:15
**distinguishable** 14:8
**document** 4:11,23;5:1,
23,25;6:7,20,21,23;7:13,
15;8:19;10:17,19,20,23;
12:5;14:12;22:19
**documents** 3:10;5:16;
5:18;19:12,25;20:1
**done** 5:23;17:6
**door** 20:24
**drop** 17:15

**E**

**earlier** 22:20
**easier** 7:22
**effect** 24:1
**effort** 24:25
**either** 19:19
**else** 11:8;10;15:20;16:24;
17:23;19:4;24:7
**employed** 7:8
**end** 3:2;4:2;11:11,15;
13:18;21:20
**enforce** 24:7
**engage** 18:25
**entered** 7:5
**entitled** 22:23
**entity** 10:14
**et** 16:19
**etc** 20:3,3
**European** 4:20
**Evangelista** 17:8,24;19:5
**EVANGELISTA** 17:10;
19:9;24:17;25:6
**even** 11:6;12:11,11;13:4
**Even** 12:14;20:20
**event** 5:1,9
**everybody** 16:24;22:9
**exactly** 14:11
**examinations** 22:8
**example** 23:1
**Exhibit** 7:20,22
**exhibits** 10:9
**explained** 4:19
**expressly** 16:3
**extent** 24:2
**Ezequiel** 16:19;17:13

**F**

**face** 9:6;10:3;11:10
**fact** 3:13,20;4:8;5:22;

6:23;8:18,19;12:5
**facts** 3:1,25
**factual** 4:1;6:13
**fair** 16:11
**falls** 16:4
**falsified** 19:1
**family** 16:25;17:1;20:25
**family's** 17:14
**far** 8:23;12:22,23;19:23;
20:18
**Fenner** 18:14
**file** 24:9
**filled** 6:21;19:24
**final** 22:7
**find** 4:3
**finding** 24:13
**FINRA** 17:11;18:10
**firm** 19:12
**first** 3:5;9:11;10:3;13:1;
18:21
**First** 13:23
**five** 22:22
**focused** 11:3,4;21:6
**form** 7:19;13:4,11,12,15;
23:12,13
**former** 3:3
**forms** 21:24
**forth** 19:24;23:13,21
**forward** 17:14,17
**fully** 24:15
**further** 21:8

**G**

**gathering** 19:11
**gave** 17:15
**general** 6:3
**General** 9:21;10:1
**genuine** 6:23
**given** 3:10
**glad** 13:7
**goes** 20:18
**good** 24:20
**Good** 24:18
**grant** 23:24,24,25
**grossly** 20:2
**guess** 3:3,6;4:18
**guy's** 13:20

**H**

**hall** 19:11
**hand** 17:23;18:3,4
**handed** 20:12
**happens** 24:21
**hard** 7:17;9:22
**Haykin** 18:17
**H-A-Y-K-I-N** 18:17
**hear** 11:14
**heard** 16:22
**himself** 15:8;21:14
**Hiram** 18:20
**hit** 17:2

**Hoffman** 11:14;19:11,20
**HOFFMAN** 11:18,21;
12:3,19,22;13:3,22;14:9,
20,23,25;15:5,16;16:2,6,9,
13,17,23;17:21;18:6,12,18,
22;19:5,22;20:8,10,14,18;
21:7;22:13;24:5;25:5
**Hoffman's** 3:18;7:20,22;
22:17
**hold** 8:11,14
**holder** 6:25;7:16;8:4,5,16,
17,20,22,24;9:7,18;12:8;
13:13;14:7,14,16;20:1;
21:10,11;22:5,10
**Holder** 7:25;14:13,13
**holder'** 13:9;23:11
**holders** 9:3;12:10;15:23
**Holders** 8:1
**holding** 8:10,10,13;9:20;
10:1
**Honor** 3:17,23;6:12;8:7;
9:15;10:10;12:22;14:20;
15:1;19:9,18;22:16;24:17,
24
**Howard** 18:17

**I**

**I'** 13:9;23:10
**ICMA** 4:11,13;5:22;6:19;
9:23;11:4;22:21
**identical** 15:21,22
**imprecisely** 15:18
**Inc** 18:15,15
**inception** 19:13
**include** 17:23
**included** 18:6
**inclusive** 23:2
**income** 20:3
**indemnification** 4:4
**indicate** 24:10
**indicates** 5:8
**individual** 9:13,19,24;
14:17;23:8
**individual's** 8:12
**inflated** 20:2
**information** 7:24;10:13;
19:1
**Information** 9:2
**initially** 8:21
**injunction** 3:8
**inquiry** 4:7;11:11,16
**instruction** 5:24
**intended** 21:14,14
**intention** 7:10,10;21:15
**interested** 15:13
**international** 13:10;
23:12
**interrupt** 16:7
**into** 7:5;16:18,18;25:1
**investment** 8:9
**Investment** 8:22;9:17
**Investments** 7:16,25;

8:15,20;9:8,11;12:8
**involved** 16:11;19:6,11,
12
**issue** 3:7,7,9,13,6:23;
7:12;23:25
**issued** 3:6
**issues** 3:20;4:1,1,8;6:12,
13;17:15

**J**

**Jacques** 20:23
**Joel** 18:20
**judge** 24:10
**Judge** 7:18
**judgment** 23:25
**June** 3:6;16:9;10;17:11,
17;23:22;24:2,15

**K**

**knew** 20:25;21:2
**knowledge** 5:13

**L**

**language** 12:25;14:5;
15:17;23:14,20
**last** 3:6;18:16,20
**later** 11:4
**law** 7:3,3;18:5
**Lazar** 18:20
**LBA** 22:8
**least** 8:23;13:15;14:17;
19:6,24;21:1
**leaving** 5:20
**legal** 7:2;13:10;23:11
**letter** 11:5;21:20,22
**letting** 24:22
**level** 20:2
**liability** 4:6;12:17,18;
13:19;15:11,14,17;20:22;
21:6;24:19
**liable** 4:3;12:15,20;13:13,
14,20;15:23
**Libowsky** 3:5;22:15
**LIBOWSKY** 3:14,17,21,
23;4:10,13,19,24;5:11;6:1,
5,8,11;7:14,18;8:6,9,9;5:8,
15;10:7,18,22,25;11:2,9;
22:16;23:1
**likelihood** 3:10
**limit** 6:14
**line** 8:1,4;9:12;12:9
**lines** 14:11,21;16:3
**list** 10:23
**listed** 9:17;14:14
**lists** 7:16;9:9;12:8
**litigation** 19:13
**little** 11:22;15:17
**logically** 3:1
**look** 7:3;11:19;13:25;
20:22;21:9,19;22:21

**looked** 7:8;14:2
**looking** 5:9;8:24;14:3
**loss** 19:14
**luck** 24:18,20
**Lynch** 5:21;8:16,23;13:5;
16:19,24;17:4,12;18:2,14,
15,24;19:2,3,8,10,24;20:3,
20,24;21:15,18;22:5

**M**

**makes** 14:7
**manifestation** 7:9,9
**manner** 19:25
**many** 15:11
**Marc** 21:10
**March** 11:4
**material** 6:23;21:12
**matter** 5:22;17:4;18:10
**matters** 6:9,22
**may** 4:22;5:4;8:15;9:25;
10:4;12:1,20;13:16;15:23;
17:22;19:22;21:4;22:24;
23:16,18;25:1
**maybe** 9:22;15:17
**Maybe** 16:10
**McCutchen** 19:8,9
**McKassin** 20:23
**me'** 13:9;23:10
**mean** 3:5;5:14;7:15;9:1;
10:9;9:11:2;12:4,5,22;13:6;
14:10,20;15:5,16;16:4;20:5
**means** 13:9;14:8;23:11
**meantime** 17:25
**meeting** 22:3
**Mellis** 18:20
**M-E-L-L-I-S** 18:21
**members** 16:25;17:1;
20:25
**memo** 13:23
**memorized** 4:15
**Mencher** 7:6
**merely** 9:16,17
**merits** 3:10;21:5
**Merrill** 5:21;8:16,23;13:5;
16:19,24;17:4,12;18:2,14,
15,24;19:1,3,8,10,24;20:3,
20,24;21:15,18;22:5
**might** 15:4;17:22,22;18:3
**million** 15:19;21:23
**minds** 22:3
**minor** 5:12
**minute** 9:1
**misleading** 19:25
**mistake** 21:13,13
**MLCS** 24:14
**money** 21:3
**more** 24:15
**most** 3:8,25
**motion** 3:4,8,15;17:24;
18:7;23:24,24,25
**Motors** 9:21;10:1
**Mrs** 12:13,13

**MARC BONNANT, v.**
**MERRILL LYNCH,**

**my'** 13:9;23:10

## N

**name** 7:16;8:15;9:4,5,10;
12:8,10;20:10
**Name** 7:25
**named** 8:22;21:10,10
**names** 9:3
**narrow** 6:12
**Nasser** 16:19,25;17:1,13;
19:12;20:23,25
**natural** 13:6,10,12;14:24;
15:24;23:2,11
**nature** 10:2
**necessarily** 13:13,14;
14:16
**need** 11:6,7,9;24:6;25:3
**negotiations** 17:2
**New** 7:2,3,5;15:9
**next** 17:5,6,16
**nobody** 14:14
**nonpublic** 18:17
**notwithstanding** 22:18
**November** 4:18
**NY** 7:7

## O

**o0o** 25:7
**objective** 7:4
**objectively** 8:24
**obligated** 22:6
**obligation** 15:18,19
**obligations** 12:23
**obliged** 15:2
**obstacles** 17:3
**obviously** 9:24
**occasion** 5:18
**occurred** 21:13
**off** 17:7
**officers** 15:10
**once** 9:10;14:23,25;15:7,
8,8
**one** 5:5;8:17;15:3;16:24,
25,25;21:25;22:9
**only** 4:7;10:15;12:7,7,21;
14:25;15:3;16:13,14;21:21;
22:10;23:5
**opened** 8:15
**opening** 9:23
**opinion** 3:6,9;6:24;18:23;
24:19
**order** 23:22;24:1,3,15
**ordinarily** 7:11
**organized** 8:11
**original** 22:2
**others** 5:23;15:24
**Otherwise** 3:15
**ought** 11:10,11
**out** 6:24;12:9;13:23;17:3;
19:11,24;20:12
**outset** 17:20;21:1

**over** 21:20
**owner** 9:19;22:6

## P

**page** 5:1;7:15;8:2,5;9:1,6,
8,9,13,14,17;10:3;11:20;
12:2;13:8;14:3,4,6,11,12,
16;18:16,16,20,21;21:9;
22:22;23:13,14
**Page** 4:25
**pages** 18:19
**papers** 3:18
**paragraph** 5:3,20;6:2,6;
11:25;22:21;23:15,17
**Paragraph** 12:2
**parallel** 14:1
**part** 3:11;18:8;19:24
**participating** 17:2
**parties** 7:4;22:4
**party** 13:17;17:1;21:19
**party's** 7:10
**pending** 17:14;19:18
**people** 20:24
**perhaps** 9:20;15:17
**Perhaps** 9:20
**person** 8:12;10:15;13:1,6,
10,12;14:24;23:2,11
**personal** 5:13;8:9,10,12,
13;9:20;10:1;12:6,17,18;
15:11,13,19;21:3,3
**personally** 12:15,20;
15:3,8;21:25
**persons** 15:24
**persuade** 13:20
**persuaded** 23:6
**piece** 22:7
**Pierce** 18:14
**place** 11:8
**places** 20:14
**plaintiff** 3:24
**plaintiff's** 3:8
**pleadings** 10:8,10
**Please** 9:2
**plenty** 21:11
**plugged** 16:18,18
**point** 5:12;14:10;16:8;
18:22,25;19:23;20:4;21:8;
22:19,20
**pointed** 6:24;12:9;13:22
**points** 22:23
**positive** 20:15
**possibility** 9:18
**possible** 3:3
**practice** 6:3
**precise** 15:1
**preclude** 9:18
**preference** 20:15
**preliminary** 3:8
**prepared** 23:4
**preprinted** 6:19;13:4
**present** 14:11
**presumably** 9:12

**prevailed** 18:24;20:3
**previously** 23:21
**primary** 7:16;8:19;9:18,
24
**Primary** 7:25;14:12
**print** 9:2
**probably** 17:19
**protestations** 22:17
**provide** 14:21
**provides** 23:9,17
**pull** 4:15
**purported** 3:25;4:1
**purposes** 6:22;13:18
**put** 5:15;8:11
**putting** 20:6

## Q

**quoted** 12:25
**quoting** 7:9

## R

**races** 17:7
**rather** 7:10
**read** 7:17,23;11:22;15:2;
23:9,14
**real** 7:10
**realize** 18:22;19:22
**really** 4:1;6:14;8:17,23;
21:6,7
**reason** 22:10;24:8
**reasons** 23:21;24:14
**recited** 23:21
**recollection** 6:7
**record** 3:11;17:23;18:7,9;
21:12;24:1
**refer** 20:13
**referenced** 14:6
**referred** 20:14
**regarding** 22:8,20
**relate** 21:5
**related** 21:5;24:8
**Related** 24:9
**relating** 16:4
**relevant** 4:11;5:11;18:24;
19:15;24:2
**reporter** 25:4
**represent** 16:17
**representative** 8:21;23:7
**represented** 19:4,8,10
**representing** 16:15
**request** 5:21
**requested** 21:25
**resolution** 18:10
**resolved** 17:22
**resolving** 4:2;17:15
**respect** 4:8;11:16;23:5;
24:13,19
**respectfully** 9:15
**respond** 22:14
**responsibilities** 22:5
**responsible** 21:19

**revolves** 15:6
**right** 3:4,12,17;4:12,25;
7:13,24;10:16;11:12,13,19;
12:25;15:4;16:4,10,15;
17:8,19;18:8;19:3,4,7;20:9,
17;22:12;23:4;24:12,16
**Right** 3:14,17;4:5;6:5;
16:2,6
**rule** 23:4
**run** 20:5

## S

**same** 5:6,6;8:18
**Sa-reer** 18:12
**saying** 14:15,16
**scheduled** 16:9;17:10,14
**second** 5:6;6:25;8:1;9:2,
11;16:7;18:20
**secretary** 5:15,17,24;6:4
**section** 13:8;14:6;16:4
**sections** 23:20
**seem** 13:11;16:21
**seems** 5:25;16:1
**Send** 21:23
**sent** 5:21;21:20,21
**separate** 6:25;18:19
**set** 9:21;19:23;23:21
**sets** 16:23;23:13
**setting** 8:13
**settled** 17:4
**settlement** 16:20
**settlements** 16:23
**settles** 24:20
**shall** 23:18
**shareholder** 9:25,25,25;
10:2,6,12,14,21;12:12,12,
14;13:14
**shareholders** 10:23;
15:10
**short** 24:1
**show** 22:2,8
**shows** 21:17
**shy** 24:22
**side** 16:14
**sign** 15:24
**signature** 5:7,15,25;6:16,
16;7:1;9:11,12;14:6,10,21;
15:3;16:3;18:16,21;23:13
**signatures** 6:15;8:2;15:7;
20:21;21:11
**signed** 5:5,14,22;6:17,20,
21,23,25;8:18,20;9:22;
11:24;13:12,24;14:3,4,19,
23,25;18:16,18,19;20:20;
22:11;23:7
**signing** 5:2,23;9:23;
11:23;13:15;14:16
**signs** 13:10;23:11
**silly** 24:10
**similar** 13:24
**simply** 8:11;13:14
**Smith** 18:15

**smokescreen** 3:24;6:14
**so-called** 6:13
**sole** 9:25;10:2,6,12,14,21;
12:11,12,14;13:14
**somebody** 19:4
**someone** 13:24;22:6
**someplace** 16:21
**somewhat** 19:14
**Sophin** 7:16,25;8:10,15,
20,21;9:8,10,17;10:2,10,
11;12:8;16:14,16;17:11;
19:15;21:22,24
**Sophin's** 10:9
**sorry** 16:7;20:10
**specific** 5:25;6:7
**specifically** 23:9
**speed** 24:11
**Srour** 18:25;20:8
**S-R-O-U-R** 18:11
**stage** 15:14
**stamp** 5:8,9,13,16,17,24;
6:3,4,16
**stamped** 6:7
**standard** 3:12,12;15:21,
23
**stands** 17:18
**state** 16:20
**statement** 3:19;10:9
**still** 17:13
**stop** 11:12
**story** 13:18
**stray** 10:17,18
**structure** 14:12
**stuff** 20:6
**style** 4:20
**subject** 17:14
**subjective** 7:8
**submit** 9:16
**submitted** 7:21;21:2
**substance** 13:25;14:2
**success** 3:10
**sued** 19:15,16
**suggest** 20:1,21
**suggested** 12:4;17:5
**suggesting** 18:25
**suggests** 21:12
**summary** 23:25
**suppose** 3:5
**sure** 5:8,19;6:9;18:9;
17:19;19:24:8
**Sure** 4:24;18:4

## T

**talking** 12:17
**talks** 6:3;10:6;13:1
**termination** 19:17
**terms** 15:25
**test** 7:4,8
**Thanks** 24:25;25:6
**theory** 15:7
**third** 20:10
**third-partied** 17:12

third-party 4:3;10:13
thought 10:16
three 13:24
times 13:24
titles 14:21
today 24:1
together 24:12
told 17:24;19:10
took 6:6
towards 22:5
transcript 25:4
trial 19:14
trust 12:13
try 22:1
trying 3:24;18:2;22:18
Tuesday 17:5,6,16
twice 6:24;8:19;9:10,22
two 13:24;15:7;16:23;
20:21;21:11

**U**

U5 18:3
ultimately 4:2,6
unambiguous 11:7,15
Unambiguous 11:16
under 3:1;4:3;7:2;9:2;
12:23;15:19
understood 8:16
up 3:2;4:2,15;8:13;9:21;
17:23;18:3;24:11;25:4
use 13:3,4;15:11;23:2
used 6:10
uses 13:1
using 6:3,4;15:17;21:17

**V**

various 20:25
vehicle 10:3
vis-à-vis 20:5

**W**

W-8 21:24
Wait 9:1
way 5:15;20:24;21:19;
22:4
Weiss 7:6
what's 4:23;5:10;8:5
whatsoever 8:6
Who's 20:7
within 15:1
word 15:12;23:2
words 15:2
written 3:11
wrong 8:13
wrongful 19:16

**Y**

York 7:3,3,5;15:9